**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

– against –

**LAWRENCE DICRISTINA,**

Defendant.

**MEMORANDUM, ORDER,**
**& JUDGMENT**

**11-CR-414**

**Appearances:**

For the government:

Office of the United States Attorney
271 Cadman Plaza East
Brooklyn, NY 11201

By:    Marisa M. Seifan
          Nathan Daniel Reilly

For the defendant:

Kannan Sundaram
Federal Defenders
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201

For *amicus curiae* Poker Players Alliance:

Kenneth M. Dreifach
ZwillGen, PLLC
415 Madison Avenue
New York, NY 10017

By:    Thomas C. Goldstein
          Tejinder Singh
          Goldstein & Russell, P.C.

**JACK B.  WEINSTEIN, Senior United States District Judge:**

<u>Table of Contents</u>

I.    Introduction ................................................................................................... 5

II.   Facts .............................................................................................................. 9

  A.   Procedural History .................................................................................... 9

  B.   Evidence on Poker .................................................................................. 10

    1.   Poker in the United States ................................................................. 11

    2.   Game Play Generally ........................................................................ 11

    3.   Expert Testimony ............................................................................. 14

          a. Defense Expert……………………………………………………...14
          b. Government Expert…………………………………………………30
          c. Defense Expert's Supplemental Report…………………………38

    4.   Other Evidence ................................................................................ 45

    5.   Conclusions of Other Courts and the States .................................... 47

    6.   Compared to Video or "Joker" Poker ............................................... 52

  C.   Evidence at Trial ..................................................................................... 53

III.  Federal Rule of Criminal Procedure 29 ...................................................... 55

IV.   Rules of Statutory Construction .................................................................. 56

  A.   Generally ................................................................................................ 56

  B.   Rule of Lenity ......................................................................................... 57

V.    Federal Gambling Laws ............................................................................... 58

  A.   Illegal Gambling Business Act .................................................................. 58

    1.   Statutory Language ........................................................................... 58

    2.   Dictionary Definitions ...................................................................... 60

    3.   Common Law .................................................................................... 62

    4.   Legislative History ........................................................................... 62

          a. Purpose of the Statute..……………………………………………62
          b. Definition of Gambling Generally…………………………………66
          c. Discussion of Particular Games……..……………………………70

    5.   Commission on the Review of the National Policy Towards Gambling......... 75

    6.   Subsequent Mafia Involvement in Poker Games ............................. 76

  B.   Other Gambling Statutes ......................................................................... 78

    1.   Contemporary with the IGBA ........................................................... 78

    2.   Pre-IGBA ........................................................................................... 81

          a. Transporting Gambling Materials...………………………………81
          b. Gambling Ships…..………………………………………………84
          c. Wire Act………………………...…..……………………………84
          d. Travel Act……………………...…..……………………………85

      3.    Post-IGBA ................................................................................ 86

             a. Indian Gambling Regulatory Act………………………………..86

             b. National Gambling Impact Study Commission Act…..……………89

             c. Unlawful Internet Gambling Enforcement Act of 2006…………....90

VI.    Proof Needed That Business Engaged in "Gambling" Under the IGBA .............. 92

  A.   Limited Case Law Interpreting 18 U.S.C. § 1955(b)(2) ..................... 92

  B.   Statutory Text and Legislative History are Ambiguous..................... 96

    1.   Text................................................................................... 96

    2.   Legislative History ............................................................ 99

    3.   Other Federal Statutes ..................................................... 100

  C.   Rule of Lenity Weighs in Favor of the Defendant ......................... 100

VII.   Poker is Not Gambling Under IGBA .................................................... 101

  A.   No Controlling Federal Cases .................................................... 103

  B.   Only "Games of Chance" Are Gambling Under IGBA ................... 104

    1.   Statute is Ambiguous ....................................................... 106

             a. Text…..…………………………………………………106

             b. Dictionary and Common Law Definitions…………………..106

             c. Legislative History………………………………………….107

             d. Other Federal Statutes…………..…………………………108

    2.   Gambling Not Limited to House-Banked Games......................... 109

    3.   Gambling is Limited to Games Predominated By Chance ........... 110

  C.   Poker is Predominated By Skill Rather than Chance ...................... 112

  D.   Poker is Not Gambling Under IGBA .......................................... 119

VIII.  Conclusion................................................................................... 120

Table of Figures

Fig. 1: Winning through time (April 2010 through March 2011) for the top and bottom ten players in terms of total dollar amounts won or lost at $5/$10 stakes…………………19

Fig. 2: Win rate comparison: Queen Jack suited (e.g. Q♠ J♠)…………………………….......23

Fig. 3: Win rate comparison: King Nine offsuit (e.g. K♠ 9♣)………………………………...24

Fig. 4: Average win rate for players of different predicted skill, for $5/$10 stakes players in the prediction group……………………………………………………………………………27

Fig. 5: Percentage of the time a higher skilled player (top 50% of skill) would predominate over a lower skilled player (bottom 50% of skill) after a given number of hands at $0.50/$1.00 stakes………………………………………………………………………………..29

Fig. 6: Percentage of the time a higher skilled player (top 50% of skill) would predominate over a lower skilled player (bottom 50% of skill) after a given number of hands at $1/$2 stakes ………………………………………………………………………………………34

Fig. 7: Simulated Cumulative Winnings of Top 10 Winners and Losers (1,000 players, 100,000 trials each)……………………………………………………………………………..36

Fig. 8: Average win rates for players of different predicted skill, for $5/$10 stakes, adding rake back in player results……………………………………………………………………40

Fig. 9: Contribution of skill to poker……………………………………………………………45

I. **Introduction**

Defendant Lawrence Dicristina is charged with operating an illegal gambling business involving poker games in violation of the Illegal Gambling Business Act (IGBA), 18 U.S.C. § 1955, and conspiring to do so. *See* Second Superseding Indictment, Doc. Entry 25, Dec. 9, 2011. The type of poker alleged and proved to have been played in defendant's establishment was "Texas Hold'em," a game described in Part II(B)(1), *infra*. When reference is made to "poker" in this memorandum, this is the variant of poker referred to.

Mr. Dicristina moved to dismiss the indictment on the grounds that a poker room does not fall under the definition of an illegal gambling business proscribed by the federal statute because poker is predominately a game of skill rather than chance. Def.'s Mot. to Dismiss the Indictment, Doc. Entry 69, June 29, 2012. He also contended that whether poker is a game of chance or skill is a mixed question of law and fact to be determined by the jury. *Id.*

Following pretrial oral argument and expert testimony, the court ruled that whether poker constituted gambling under the applicable federal criminal statute would be decided as a matter of law. *See* Tr. of *Daubert* Hr'g 89:1-5, July 6, 2012 ("Def. Expert *Daubert* Hr'g Tr."). Decision on the motion to dismiss was reserved. The case proceeded to trial, the jury being instructed that poker constituted gambling under the IGBA. Defendant was convicted on both counts. He then renewed his motion for a judgment of acquittal. *See* Def.'s Mem. of L. in Supp. of his Mot. for a Judgment of Acquittal Under Rule 29 of the Federal Rules of Criminal Procedure, Doc. Entry 92, July 19, 2012.

Although the defendant initially raised the issue of whether poker as played in this case is gambling under New York law, *see* Def. Expert *Daubert* Hr'g Tr. 85:5 – 86:1—the violation of which is an element of the federal offense, *see* 18 U.S.C. § 1955(b)(1)(i)—he has not renewed

this aspect of his motion. *See* Def.'s Mot. to Dismiss the Indictment, Doc. Entry 69, June 29, 2012. The argument is waived. In any event, it has no merit. New York courts have long considered that poker contains a sufficient element of chance to constitute gambling under that state's laws. *See* N.Y. Penal Law § 225.00(2) ("'Gambling.' A person engages in gambling when he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome."); N.Y. Penal Law § 225.00(1) ("'Contest of chance' means any contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein."); *In Re Plato's Cave Corp. v. State Liquor Auth.,* 496 N.Y.S.2d 436, 438 (1st Dep't 1985), *aff'd* 498 N.E.2d 420 (1986) (holding that a Joker Poker video game fell under § 225.00's definition of gambling in partial reliance on its similarity to poker; "[a]lthough there is a degree of skill and concentration involved in playing poker, 'the outcome depends in a material degree upon an element of chance,' i.e., the draw of the cards"); *see also Dalton v. Pataki*, 780 N.Y.S.2d 47, 64 n.5 (3d Dep't 2004) (noting that "the term 'game of chance' or 'contest of chance' . . . has been interpreted to include such games as 'stud' poker"), *aff'd* 498 N.E.2d 420 (1986); *People v. Turner*, 629 N.Y.S.2d 661, 662 (N.Y. Crim. Ct. 1995) ("Games of chance range from those that require no skill, such as a lottery . . . , to those such as poker or blackjack which require considerable skill in calculating the probability of drawing particular cards. Nonetheless, the latter are as much games of chance as the former, since the outcome depends to a material degree upon the random distribution of cards. . . . The skill of the player may increase the odds in the player's favor, but cannot determine the outcome regardless of the degree of skill employed."); *People v. Dubinsky,* 31 N.Y.S.2d 234, 237 (Bronx

Cnty. Ct. Spec. Sess. 1941) ("There is no doubt that playing 'stud' poker for money is a game of chance and constitutes gambling."); *id.* at 238 ("[T]he courts of many states including our own seem to be unanimous in their holding that where a host receives some consideration or some payment for permitting a card game to be played or other gaming to take place in his premises, that constitutes gambling."); *cf. Katz's Delicatessen, Inc. v. O'Connell*, 97 N.E.2d 906, 907 (N.Y. 1951) (holding that "a social game of poker played in a basement room" of a liquor store violated a law which provided that "[n]o person licensed to sell alcoholic beverages shall suffer or permit any gambling on the licensed premises, or suffer or permit such premises to become disorderly"). This series of New York State decisions do not decide the issue now posed: whether a business involving illegal poker games violates the federal IGBA.

The defendant's argument in favor of dismissal is two-fold. First, he claims that even if poker is "gambling" under New York law, not all violations of state gambling laws constitute "gambling" prosecutable under the IGBA. The federal statute defines gambling as "includ[ing] but . . . not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein." 18 U.S.C. § 1955(b)(2). He submits that this definition limits which state gaming laws trigger prosecution under the IGBA: a business must involve games sufficiently similar to the nine games enumerated in the federal definition in order to be prosecuted as a "gambling business" under the IGBA. Second, he contends that the poker room he operated does not constitute a "gambling business" under this narrow definition—that is to say, that a game run by a "gambling business" must be both house-banked and predominated by chance in order to be sufficiently similar to those enumerated, and that his poker enterprise was neither.

The government counters that § 1955(b)(2) does not, by its plain language, restrict what kinds of games constitute gambling under the IGBA. Urged is that the goal of the federal statute was to curb the influence of organized crime, which derived substantial revenues from illegal gambling, and that the federal law was passed to bolster states' efforts on this front. It follows, so the argument goes, that any gambling activity that is illegal under state law is "gambling" under the IGBA. Gov't Response in Opp. to Def.'s Mot. to Dismiss the Indictment and Mot. to Preclude Expert Testimony, Doc. Entry 76, July 5, 2012

Both the defendant's and the government's interpretations of the statute are plausible. It is unclear from the text and legislative history of the IGBA whether every state gambling offense would permit a federal conviction. *See* Part VI, *infra*. It is equally uncertain whether, in enacting the statute, Congress foresaw that poker businesses would be prosecutable under it. *See* Part VII, *infra*.

In light of these ambiguities, the rule of lenity requires that the defendant's interpretation be adopted, and his conviction be dismissed. His acts did not constitute a federal crime.

Declaring that the federal gambling statute does not cover poker games of the type operated by the defendant does not prevent federal law enforcement agencies from achieving the goals of the statute, as put forward by the government, or encroach on any states' ability to proscribe these card games. In poker games controlled by the Mob, a violation of state gambling laws would permit federal prosecution under the Racketeer Influenced and Corrupt Organizations Act (RICO). *See* 18 U.S.C. §§ 1961–1968. Even if the gambling business is not Mob-controlled—as it was not in this case—New York State gambling laws would permit prosecution in state court. *See, e.g.* N.Y. Penal Law § 225.05.

For the reasons stated below, the defendant's conviction is vacated, and the indictment dismissed.

## II. **Facts**

### A. **Procedural History**

On December 9, 2011, defendant Lawrence Dicristina was charged in a second superseding indictment with operating an illegal gambling business involving poker games in violation of the IGBA (Count Two) and conspiring to do so (Count One). *See* Second Superseding Indictment, Doc. Entry 25, Dec. 9, 2011. He initially pled guilty to Count Two, the substantive IGBA offense. *See* Tr. of Guilty Plea, Doc. Entry 40, Dec. 12, 2011. At his sentencing hearing, he moved to withdraw his plea. Doc. Entry 50, May 1, 2012. The plea was withdrawn, and a trial date was set. *Id.*

A week before trial, the defendant moved under Federal Rule of Criminal Procedure 29(b) to dismiss the indictment, contending that poker did not constitute gambling as defined by the IGBA. *See* Def.'s Mot. to Dismiss the Indictment, Doc. Entry 69, June 29, 2012. An amicus brief in support of his argument was filed by the Poker Players Alliance (PPA). *See* PPA Mot.to File an Amicus Br. in Supp. of Def.'s Mot. to Dismiss, Doc. Entry 74, July 1, 2012. The defendant also sought to introduce expert testimony at trial to show that poker was a game of skill rather than chance and thus outside the purview of the statute. *See* Doc. Entry 73, July 3, 2012.

Following a *Daubert* hearing, defendant's witness was permitted to present his opinion as an expert, but his testimony was excluded from the trial as irrelevant. *See* Def. Expert *Daubert*

Hr'g Tr. 84:1-2. It was ruled that whether poker constituted gambling was a matter of law that would be decided by the court, rather than by the jury. *Id.* 89:1-5.

Decision on defendant's motion to dismiss was reserved. *Id.* He renewed his motion at the close of the government's case, Tr. of Trial 264:2-3, July 10, 2012, and at the close of evidence, *id.* 325:18-23, with decision again reserved.

After it was instructed that running a poker establishment was illegal, the jury convicted the defendant of both Counts One and Two. *See* Doc. Entry 91, July 12, 2012. Additional briefing on the motion to dismiss was submitted following the verdict.

The government submitted evidence at a post-trial *Daubert* hearing held on August 10, 2012. *See generally* Tr. of *Daubert* Hr'g, Aug. 13, 2012 ("Gov't Expert *Daubert* Hr'g Tr."). Experts for the government and the defendant testified independently and in a joint discussion with the court, submitting reports supplemented by extensive briefs and letters. *See id.;* Def. Letter Attaching Expert Report App. (Report of Dr. Randall Heeb), Doc. Entry 77, July 6, 2012 ("Def. Expert Report"); Report of Dr. David DeRosa, Doc. Entry 103, Aug. 10, 2012 ("Gov't Expert Report"); Def.'s Letter Addressing Issues Raised at Aug. 10 *Daubert* Hearing App. (Supplemental Report of Dr. Randal D. Heeb), Doc. Entry 104, Aug. 13, 2012 ("Def. Expert Supp. Report"); Gov't Reply to Def.'s Letter Addressing Issues Raised at Aug. 10 *Daubert* Hearing, Doc. Entry 107, Aug. 17, 2012 ("Gov't Reply Letter"); Def.'s Letter Reply to Gov't Aug. 17, 2012 Letter, Doc. Entry 108, Aug. 20, 2012.

### B. **Evidence on Poker**

Central to the issue of whether poker falls within the ambit of the statute is: 1) whether Congress, at the time of its enactment of the IGBA, understood "gambling" to include poker; and

2) whether poker is, like the other games enumerated in that statute, a game predominated by chance.

### 1. **Poker in the United States**

Poker has a long history in the United States. *See, e.g., "The National Game,"* N.Y. Times, Feb.12, 1875 (describing the spread of literature on poker). The game first appeared in roughly its modern form in the early nineteenth century in New Orleans. James McManus, *Cowboys Full: The Story of Poker* 51 (2009). It has been embraced by many of our political leaders and other public figures. For example, "Justice Douglas was a regular at President Franklin Roosevelt's poker parties; Chief Justice Vinson played poker with President Truman." *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 541 U.S. 913, 917 (2004) (citing J. Simon, Independent Journey: The Life of William O. Douglas 220-221 (1980); D. McCullough, Truman 511 (1992)). Driven in part by the Internet, which allows for online poker playing, and cable television, which frequently broadcasts poker tournaments, the game has surged in popularity in recent years. Anthony Holden, *Bigger Deal: A Year Inside the Poker Boom* 1, 10 (2007). In 2006, 8,773 players entered the "main event" in the World Series of Poker, the most prestigious poker tournament in the United States, and more than 44,500 players participated in the tournament at large. *Id.* at 1.

### 2. **Game Play Generally**

While there are several major variants of poker, the defendant's business involved "No-Limit Texas Hold'em," a game of increasing popularity. *See* Def. Expert *Daubert* Hr'g Tr. 14:24 – 15:4; Part II(C), *infra.* No-Limit Texas Hold'em is currently the most popular variant of poker. *See* Def. Expert *Daubert* Hr'g Tr. 14:12-22.

Texas Hold'em poker has been described as follows:

The game is usually played with at most 10 (and at least 2) players. Like most variants of poker, the objective in hold'em is to win pots, where a pot is the sum of the money bet by all players in a hand. A pot is won either at the showdown by forming the best five card poker hand out of the seven cards available, or by betting to cause other players to fold and abandon their claim to the pot. The objective of a player is not to win the maximum number of individual pots, but rather to make mathematically correct decisions in order to maximize the expected net amount won in the long run.

. . .

Hold'em is often played using small and big blind bets. A dealer button is used to represent the player in the dealer position; the dealer button rotates clockwise after each hand, changing the position of the dealer and blinds. The small blind is posted by the player to the left of the dealer and is usually equal to half of the big blind. The big blind, posted by the player to the left of the small blind, is equal to the minimum bet.

. . .

A play of a hand begins with each player being dealt two cards face down from a standard deck of 52 cards. These cards are the player's hole or pocket cards, they are the only cards each player will receive individually, and they will only (possibly) be revealed at the showdown, making hold'em a closed poker game. After the pocket cards are dealt, there is a "pre-flop" betting round, beginning with the player to the left of the big blind (or the player to the left of the dealer, if no blinds are used) and continuing clockwise. A round of betting continues until every player has either folded, put in all of their chips, or matched the amount put in by each other active player.

After the pre-flop betting round, assuming there remain at least two players taking part in the hand, the dealer deals a flop; three face-up community cards. The flop is followed by a second betting round. This and all subsequent betting rounds begin with the player to the dealer's left and continue clockwise.

After the flop betting round ends a single community card (called the turn) is dealt, followed by a third betting round. A final single community card (called the river) is then dealt, followed by a fourth betting round and the showdown, if necessary.

If a player bets and all other players fold, then the remaining player is awarded the pot and is not required to show his hole cards. If two or more players remain after the final betting round, a showdown occurs. On the showdown, each player plays the best five-card hand he can make from the seven cards comprising his two pocket cards and the five community cards. A player may use both of his own two pocket cards, only one, or none at all, to form his final five-card hand. If the five community cards form the player's best hand, then the player is said to be playing the board and can only hope to split the pot, since each other active player can also use the same five cards to construct the same hand.

If the best hand is shared by more than one player, then the pot is split equally among them. The best hand is determined according to the ranking

described below. If the significant part of the hand involves fewer than five cards, (such as two pair or three of a kind), then the additional cards (called kickers) are used to settle ties. Note that only the card's numerical rank matters; suit values are irrelevant in Hold'em.

PPA Mot. for Leave to File an Amicus Br. Ex. B (Noga Alon, Poker, Chance and Skill 2-3 (unpublished manuscript)), Doc. Entry 74, July 3, 2012.

The government does not dispute that skill plays some role in poker, particularly in "no-limit" poker games. As one writer has described the matter:

> The limits, or absence of limits, on how much a player may bet and raise will dramatically affect the game dynamics, including players' decisions and strategies and the relative balance of luck versus skill in the game. . . . In no-limit games, a player may bet or raise any amount he has in front of him (table stakes limit betting in a hand to the chips and money on the table). . . .
> While the initial distribution of cards and replacement cards are random, the decision on which cards to discard, the methods and steps in betting, the analysis of playing habits of other players, and the management of a player's chips from hand to hand are all skills. . . .

Anthony Cabot & Robert Hannum, *Poker: Public Policy, Law, Mathematics, and the Future of an American Tradition,* 22 T.M. Cooley L. Rev. 443, 450-54 (2005).

> A skilled player should be able to assess the strength of his hand as a function of his hole cards, the community cards, the number of players still in the game, their betting strategy and the position at the table. He should be able to assess the model of play of the other players, estimate the probability of improving his hand once the next community cards are revealed, and should be able to hide his strategy by bluffing and leaving his behavior unpredictable.

PPA Mot. for Leave to File an Amicus Br. Ex. B (Noga Alon, Poker, Chance and Skill 16 (unpublished manuscript)), Doc. Entry 74, July 3, 2012.

Unlike other games commonly considered gambling, such as roulette, craps, or blackjack, the house does not participate in game play during poker games. Cabot & Hannum, *supra,* at 452.

Instead, players compete against each other, and money won or lost is merely transferred from one player to another. The casino provides a dealer, who does not play, and the casino makes money by taking a percentage of each pot, charging an hourly fee, or collecting a flat amount for every hand. The first of these is the most common; a "rake" (percentage extracted) of 5% to 10% is typical.

Cabot & Hannum, *supra,* at 452-53.

### 3. **Expert Testimony**

#### a. **Defense Expert**

At a July 6, 2012 pretrial hearing, Dr. Randal D. Heeb, a respected economist, statistician, and player in national poker tournaments, testified as an expert on game theory. *See* Def. Expert *Daubert* Hr'g Tr. 12:7-8. He highlighted the number of skilled strategic choices, such as how much to wager, made by poker players in the course of playing a single hand:

> [T]here's a very large number of decisions that need to be made by a poker player playing any given hand. . . . The simplest and most obvious choice that a player has to make is simply whether to play a particular hand. . . . [For example, a hand with a King and a Nine in different suits] is a hand which is particularly easy for unskillful players to play badly, and for skillful players to play well. And the very first decision that a player has to make is simply whether or not to play and how much to bet, and less skillful players seeing a King and a Nine, which seem like relatively high cards, and when the King comes, they will have a pair of Kings, which seems like a relatively strong hand, and yet unskillful players tempted to play that hand are very likely to bet too much and to lose to players with even better hands. Because even though it seems like a good hand, when you happen to get another King, you make a strong hand, it seems like you are likely to win. In fact, you may win relatively many hands. You are not going to win very much money with that hand, and when you lose, you are likely to lose a lot of money. So unskillful players tend to play that hand poorly, and make bad decisions, not only the decisions you play, but also how much to bet, how to respond to other players, when other players raise them, for example.
>
> So a more skillful player would recognize that the only way to win with that hand would be, for example to get a pair [of] Kings, and if nobody else has anything that is a very good hand, you are likely to win almost nothing with that pair of Kings. On the other hand, if another player, instead of starting with a King

Nine, had a King Ace, and now when all of the common cards are dealt subsequently in the game, a King appears, both players would have a pair of Kings, but the player with the Ace King would have a much stronger hand and therefore win much more often and much more. The less skillful player would have a tendency to bet too much with the King Nine early, and would also tend to call too often later.

Tr. of Hr'g 26:22 – 28:12, July 6, 2012.

Bluffing, raising, and folding require honed skills to maximize the value of the cards

dealt by Lady Luck:

[Wagering is] also used to try, for example, to force an opponent to fold their hand, and there are two relevant aspects of that strategic play. One would be a bluff. If I think you have the best hand and I want to bet an amount that is going to induce you to give up your hand, you know, that's one element of the wager. And what's important about that wager is not that I am betting on the outcome of some outside event, but rather the amount that I choose to bet is carefully strategically chosen in order to influence your behavior, and I choose an amount based on what I think [you] will do, given the amount that I bet, and it can go two different ways. Sort of the novice way to think about this is the more that I bet, the more likely you are to fold, because it's harder for you to put up more money to call my bet. With more expert players, they would anticipate that effect. And, so, there's a bluff that has a name among poker players called a "post oak bluff" where you bet a small amount to make your opponent think you are trying to make them call. So they think about that with their model of how you play, and they decide to fold because of the small amount that I bet. And so the amount that you bet becomes incredibly important.
    There's a second way that the amount that you bet, whether or not to bet becomes important. Even if I'm pretty sure I got the best hand, I may want you to fold because, for example, if you have a flush draw and I have the best current hand, I may not want you to get your chance to make your flush. So I will bet an amount designed to make it uneconomic for you to make the call, and if you are a good player, you will recognize that and you will fold. If you are a bad player, you will make an unskillful play that actually wins me money over time. So by making that correct amount of the bet, I've influenced the outcome, both immediately in the single hand and over the long haul, the amount that I win over time playing against either skillful or unskillful players. So . . . whether or not to bet, whether or not to raise, which is going to bet zero, let the other person bet and raise after the fact, these are all strategic elements which are the essence of poker, and in that sense there's nothing analogous to that in a game of chance like betting on a football game or betting on the roll of the dice.

*Id.* 50:8 – 51:24.

Position at the table and the habits of fellow players must be taken into account to play successfully.

> [A]nother very simple thing to notice that unskillful players don't tend to notice . . . is that the position at the table matters. So the person [who] has to act first is at a disadvantage, because they don't know what the other players are going to do. So the person that acts last, and because you act in turn around the table in a clockwise fashion, the person that acts last has a big advantage. They got to see what other players did before they made their choices. So a skillful player recognizes that advantage and . . . changes their strategy, plays more hands, and plays them more aggressively in later positions, but at the same time folds their hands and plays more conservatively, if other players have acted with strength in front of them.
> So if a player has a bet in an early position, that is a relatively strong play. And so a player that gets to play later, would take that into account if they are a skillful player, and would only play a very strong hand.
> Yet another way that a skillful player can use relatively simple information is to recognize how skillful their opponents are and change their strategy based on who they are playing against. So if a skillful player bets in an . . . early position—and I know that that is a skillful player because I have observed how they played the rest of their hands—I know that they know that that early position is a dangerous position for them to be in. So if a skillful player bets in that position, I . . . think they . . . have a stronger hand, I react accordingly. Unskillful players don't even notice this. So, again, that's a relatively easy play that can be learned in one day of training and a couple of days of practice, which would dramatically improve a player's results.

*Id.* 37:3 – 38:9; *see also id.* 49:7-16 ("In poker, you don't know the cards that [the other players] have, but they know what cards they have. They don't know the cards that you have. So you have a model of your opponent and how they react to the situation that they see. They have a model of you in their mind, and how well the players play, make their decisions to use this information, which is generated by the chance mechanism, the way in which they then use the information that they do have to make their strategic choices is what makes poker such an . . . interesting game."). When poker is played live, as it was in the instant case, rather than on a computer, additional skills come into play, such as "the ability to read their opponent, to detect

from their opponent's betting behavior, from their tone of voice, from their reactions, whether or not they have a good hand." *Id.* 42:1-4.

Dr. Heeb opined that poker differs from other forms of gambling, such as sports betting, because the player can rely on sophisticated skills to change the outcome of the game. *Id.* 49:17-20.

> [T]he player in a poker game is making all of the decisions, making all the plays, which include whether or not to wager on a particular hand and how much. And, in fact, the act of wagering itself is the essence of the decision. So in one sense in a gamble over any other mechanism, whether it was a bet on a baseball game or a bet on the roll of the dice, the wager itself is completely independent of the event being wagered on. Whereas, in poker, the wager is not in the same sense a wager on the outcome. It is the strategic choice that you are making. You are trying to influence the outcome of the game, either by the amount that you are wagering, trying to build up and win more money.

*Id.* 49:21 – 50:8.

According to Dr. Heeb, "many people make a living playing poker and win consistently over time" whereas "it is impossible to make a living and to win consistently playing casino games such as roulette" where chance predominates. Def. Expert Report at 11. This fact alone was an independent foundation for his opinion that skill predominates over chance in poker. *Id.*

As shown in Figure 1 below, prepared by Dr. Heeb, the ten most proficient players earn dramatically more money than the ten least proficient players over the course of a year. The most skillful professionals earn the same celestial salaries as professional ball players.

The expert for the government, Dr. DeRosa, demonstrated—and Dr. Heeb conceded—that a figure similar to Figure 1 could be obtained by chance tosses of a coin. *See* Part II(A)(B)(3)(b), *infra*; Gov't Reply Letter at 3. But, while Dr. Heeb showed that the same poker players would consistently come out on top in the play of a new set of multiple hands of poker,

this consistency could not be demonstrated in a new set of coin tossers by the same tossers. *See* Part II(B)(3)(c), *infra*.

Fig. 1: Winning through time (April 2010 through March 2011) for the top and bottom ten players in terms of total dollar amounts won or lost at $5/$10 stakes



Note: For illustrative purposes, in this figure all the hands played by each player are distributed evenly from left to right across the graph. Thus, for example, the midpoint of the graph marks the midpoint of each player's playing history. Some players played more hands than others, and they may have played them at different times. However, all of the players depicted in the graph played a high volume of hands.

According to Dr. Heeb, Figure 1 shows that the ten best players "win consistently" and that "these players' cumulative amounts won are nearly always increasing," even though they may have "a few losing days or weeks." *Id.* By contrast, the ten worst players "are consistently losing throughout the year." *Id.* He posits that "[t]he fact that the winning players tend to win consistently and the losing players tend to lose consistently demonstrates that there is a skill differential between these groups." *Id.*

Dr. Heeb acknowledged that poker also involves an element of chance. Def. Expert *Daubert* Hr'g Tr. 58:12-13. "On any given hand . . . the probabilities are certainly finite." *Id.* 62:14-15. The following hypothetical posed by the government to Dr. Heeb on cross-examination is illustrative:

> Q. . . . The lower skilled player has seven deuce offhand, which is . . . statistically the wors[t] starting hand in poker; is that correct?
> A. Yeah, probably.
> Q. And the higher skilled player has two aces, which is the best starting hand . . . in hold'em poker; is that right?
> A. That's right. That's right.
> Q. And when the hand starts, the high skilled player with the two aces is about an 87 percent to 12 percent favorite. . . .
> A. That sounds right.
> Q. So . . . the lower skill player perhaps demonstrating his lack of skills goes all in for $500 with his seven deuce off suit and the higher skill player calls that. Just as a matter of percentage, the lower skilled player has about a 12 percent chance of actually winning that hand, correct?
> A. At the point that they both made the bet and called the be[t], yes.
> Q. So about one out of ten times, give or take, in that scenario, the lower skilled player will actually win?
> A. That's right, one out of eight actually.
> Q. . . . And at that point the lower skilled player can take his money and go home, right?
> A. There's nothing to stop a player from quitting, I guess.
> Q. And the fact that the higher skilled player is higher skilled, doesn't get him his money back, right?
> A. That's right

*Id.* 70:4 – 71:10; *see also* 57:18-24 ("For example, a bad beat [a subjective term for a hand in which a player with what appear to be strong cards nevertheless loses], . . . might be a hand in which after the play of the hand, the betting has all been made, I believe that I have or I may even know exactly that I have an 85 percent chance of winning and a 15 percent chance of losing, and a bad beat would be a hand on which the 15 percent chance occurs.").

He acknowledged that poker falls in between chess, which he characterized as an almost pure game of skill, and roulette, which he characterized as a pure game of chance. *Id.* 44:8 – 45:9. According to Dr. Heeb:

> [T]he question then is: How do you know if skill predominates over chance in poker? And the right way to analyze that question is to ask: Over how long does it take for skill to essentially show itself and predominate over the element of chance? And the answer is that it's sufficiently few number of hands, that a player could reach that number of hands in a few playing sessions. And, again, depending on how skillful that player is, an extremely skillful player, that player's skill would manifest itself in that player's results relatively quickly.

*Id.* 45:9-18.

Based on his research, Dr. Heeb concluded that skill predominated over chance in determining the outcome of a poker game. He summarized the results of his study of 415 million hands of No Limit Texas Hold'em that were played on-line at the PokerStars website from April 2010 to March 2011. *Id.* 13:3-9. To verify the reliability of the data he received from PokerStars, he obtained publicly available data from HandHQ, a company that tracks hands played on PokerStars and other online poker sites. Def. Expert Report at 10. Using this outside source, he confirmed that the data received from PokerStars was an accurate records of hands played. *Id.* Although his information came

from internet poker, rather than face-to-face games, Dr. Heeb concluded that the data set

he chose was appropriate:

> The game is a game of skill in exactly the same way, whether it's played live or played over the internet . . . . So my conclusions . . . carry over exactly to when the exact same game is played, whether it is played in person, played with cards, . . . or played electronically over the internet. The only difference between playing live and playing in person is that the live game brings in some additional elements of skill which are not available to the internet player.

Def. Expert *Daubert* Hr'g Tr. 41:13-24. Using this sizable data set, Dr. Heeb conducted two

different analyses to evaluate the relative effect of skill and luck on players' success rate in

poker.

First, he looked at whether a player's average win rate on all other hands was predictive

of their success in a particular kind of hand—for example, a King and a Nine in different suits

(the King Nine hand). *Id.* 22:14 – 23:3. He divided players into two groups: those whose

success rate was above the median, and those whose success rate was below the median. *Id.*

24:13-22. Players whose success rate was above the median were more successful with the King

Nine hand than players whose success rate was below the median. *Id.* 24:23 – 25:3. As

summarized in Figures 2 and 3, more highly skilled players won more—or lost less—than lower-

skilled players when dealt the same hand.

Fig. 2: Win rate comparison: Queen Jack suited (e.g. Q♠ J♠)



Note: Based on $1/$2 No-limit Hold'em; 6 max tables with 6 active players; all positions included; includes all Q J suited combinations.

Fig. 3: Win rate comparison: King Nine offsuit (e.g. K♠ 9♣)



Note: Based on $1/$2 No-limit Hold'em; 6 max tables with 6 active players; all positions included; includes all offsuit K 9 combinations.

Dr. Heeb concluded that a player's skill had a statistically significant effect on the amount of money won or lost in a particular hand in poker. *Id.* 25:15-19; 26:11-18; *see also id.* 28:21 – 29:3 (The fact that "players who tended to play poorly with all the rest of their cards, also played poorly and lost, or [won] less, with any particular hand, would be sufficient onto itself to demonstrate that the actions of the skillful players are skill, not luck, because if they were lucky, of course the fact that they were lucky on one set[] of cards, would have no influence on how they did with other cards."). While Dr. Heeb acknowledged that "in a single hand, what cards are dealt is going to be an even more important factor, . . . regardless of which hand a player is dealt," he explained that "when players are dealt the same hand, the more skillful player plays it much better and achieves a better result." Def. Expert *Daubert* Hr'g Tr. 39:6-15. *But see* Gov't Reply Letter at 6 (contending that "what hand a player is dealt is the predominant determinant of how much he will profit or lose *from that hand*").

Second, he randomly divided the same data set into two groups. *Id.* 30:21-24. He used regression analysis on the first group to create "a skill index that related how skillfully the player played to what their actual win rates were." *Id.* 31:19-21. His skill index included "240 statistics about their play. [It wo]uld be equivalent -- if I could draw another analogy, and I hope that this isn't stretching it too far, but a baseball player that decides how often they swing at the first pitch or whether they are waiting for a curve ball or a strike." Gov't Expert *Daubert* Hr'g Tr. 103:4-8. He then applied the skill index to the second analysis group to see whether players who were predicted to be of high skill actually won significantly more money than players predicted to be of low skill. Def. Expert *Daubert* Hr'g Tr. 33:1-5. He found that "[t]he lowest skill players according to the predicted skill index in fact achieve much worse results. Average players still don't do very well. Very good players are winning players." *Id.* 33:7-10.

As illustrated in Figure 4, a player's win rate increases as his skill level increases.  Win rate is calculated as a fraction of the big blind won per hand, on average.

Fig. 4: Average win rate for players of different predicted skill, for $5/$10 stakes players in the analysis group

Dr. Heeb explained Figure 4 as follows:

> The line slopes upward to the right, indicating that players with higher predicted skill on average have higher win rates. If poker were a game of chance, there would be no relationship between predicted skill and results. The slope of the line reflects the much higher expected win rate of skillful players compared to less skillful players. This relationship characterizes games of skill.

Def. Expert Report at 36.

Dr. Heeb then divided the analysis group into players with skill below the median and players with skill above the median. Def. Expert *Daubert* Hr'g Tr. 33:19-23. As shown in Figure 5 below, he found that "it takes about 900 hands of poker for the high skill group to predominate over the low skill group with 90 percent confidence" and about "1400 hands for 95 percent confidence." *Id.* 34:2-4; 34:12-13.

Fig. 5: Percentage of the time a higher skilled player (top 50% of skill) would predominate over a lower skilled player (bottom 50% of skill) after a given number of hands at $0.50/$1.00 stakes



Dr. Heeb testified that this number of hands is "quite reasonably played in a relatively short amount of time by players that are playing poker seriously" and that "over a longer period of time, skill predominates even more." *Id.* 34:19-23; *see also* Gov't Expert *Daubert* Hr'g Tr. 92:22 – 93:8 ("90 percent of the time the top half [in a $1/$2 game, *see* Fig. 6, *infra*] would be ahead after 880 hands, which is about 30 hours of play. . . . [A]t the World Series [of Poker], a typical one day of play is 10 hours, excluding breaks, so it actually takes about 13 hours to play 10 hours of play. That's a standard day. A standard tournament takes three days. So in the amount of time it takes players to play one poker tournament, 90 percent of the more skillful half of the players would be ahead of the less skillful half of the players.").

Based on these analyses, this expert concluded that skill predominates over chance in poker. *Id.* 18:4-5. He also noted that the "topic . . . has been addressed by a number of other researchers, none of whom had the data I have available with the whole cards available to me. All of the results that I have seen, both in published and unpublished papers, are all consistent with the result that skill predominates over chance." *Id.* 40:20-25; *see also* Part II(B)(4), *infra*.

b. **Government Expert**

The government's expert, Dr. David DeRosa, who is also a well-qualified econometrician, testified at a post-verdict *Daubert* hearing on August 10, 2012. *See generally* Gov't Expert *Daubert* Hr'g Tr. Dr. Heeb was present at the hearing to answer questions regarding his report and participate in a technical discussion with Dr. DeRosa and the court. *See generally id.*

Unlike Dr. Heeb, Dr. DeRosa neither has any personal experience with poker, *see id.* 6:7-14, nor has he independently analyzed the game. Moreover, he noted that he had "not been provided with any of the data or statistical analyses summarized in Dr. Heeb's report." Gov't

Expert Report at 2. His testimony was thus limited to a critique of whether "Dr. Heeb's stated results support his overarching conclusion, namely that skill predominates over chance in poker." *Id.* He did not offer any opinions as to the validity of Dr. Heeb's calculations or his general methodology. *Id.*

Dr. DeRosa acknowledged that "the actions of [poker] players ha[ve] some impact on the outcome [of the game] and poker is not a game of pure chance." *Id.* at 10. Nevertheless, he had several criticisms of Dr. Heeb's work.

First, he argued that Dr. Heeb's analysis erroneously relied on "relative skill rather than likelihood that a player will earn a profit." *Id.* at 4. According to Dr. DeRosa:

> Poker players play poker to win money. A player will consider himself a winner if he earns a profit. The fact that he may lose less money than another player is likely to be of cold comfort. I believe that the proper metric for determining success at a session of poker is whether or not a player profits from playing the game.

*Id.* at 6; *see also* Gov't Reply Letter at 1-2 (emphasizing this point). Yet Dr. Heeb's own data shows that most players lose money at poker. Dr. DeRosa pointed to Figure 4, *supra*, which he said shows that:

> [P]layers in the 51st to 75th skill percentile lost approximately .15 to .45 [of the big blind] per hand. In the $5/$10 game Dr. Heeb analyzes [in Fig. 4, *supra*], this equates to a loss of approximately $1.50 - $4.50 per hand.
> Even top players in the 90th skill percentile appear to have, on average, suffered losses from their poker playing. Only between the 90th and 95th skill percentile does it appear that "skillful" players begin to experience a positive win rate (i.e. have a positive expected return).

Gov't Expert Report at 6-7; *see also* Gov't Reply Letter at 3.

Dr. DeRosa concluded from the fact that so many players lose money that "if a player were to make a profit at any given session in a game where he faced a negative expected rate of return, such profit would have to be primarily as the result of luck." Gov't Expert Report at 7.

Because so few players win money, he contended, skill cannot predominate over luck in poker. *See* Gov't Expert *Daubert* Hr'g Tr. 9:7-17 ("I go in with a certain amount of money, and I leave with more money. And if I don't do that, I am a loser. I'm a loser. So a lot of this ranking stuff is irrelevant because skill should be winning money. And as I read the report and as I read Dr. Heeb's testimony, probably 95 percent of the people who play this online poker lose money so I don't understand where the skill is. How could it be skillful playing if you're losing money? And I don't consider it skill if you lose less money than the unfortunate fellow who lost more money."); *id.* 24:25 – 25:5 ("But the other striking thing that I found was the idea that 95 percent of these people lose money. So for 95 percent -- according to the report that I read. That win rate is a negative number so 95 percent of them lose money. So, Your Honor, isn't then poker a game of chance, not skill, just on that alone?").

Second, Dr. DeRosa disagreed with Dr. Heeb's use of cumulative data—i.e., his examination of results over a large number of hands—to evaluate whether skilled players outperform unskilled players. Dr. DeRosa instead stated that the relevant frame of reference for determining whether skill or chance predominates is a single hand. Gov't Expert *Daubert* Hr'g Tr. 27:12-18 ("[T]here's no requirement that you have to play forever. It's not like a game of golf where you have to play all 18 holes. It's not like a game of tennis where you have to play three sets. You can drop out any time you want. So the fact that if you play one hand chance is the material decider, I would say that says it right there.").

> [N]o matter how long a player sits at a table, the probability of receiving any given hand is the same on the next hand before the cards are dealt as it was for every other hand in the game. This is reminiscent of a famous paradigm from basic probability theory. If red has come up 20 times in a row in roulette, it does not mean that "black is due." The probability of getting red or black (or green) with each spin of the wheel is independent of prior history. From this point of view, Dr. Heeb's analysis of long-term results is of limited value . . . .

Gov't Expert Report at 10; *see also* Gov't Reply Letter at 2-3. Moreover, he argued, without independent factual support, that the number of hands required for skill to predominate over chance in poker to a reasonable degree of statistical confidence exceeded the number played by an average player. For example, as shown in Figure 6, in order for a skilled player to beat an unskilled player with 95% confidence in a game with $1/$2 stakes, the player would have to play 1,399 hands.

Fig. 6: Percentage of the time a higher skilled player (top 50% of skill) would predominate over a lower skilled player (bottom 50% of skill) after a given number of hands at $1/$2 stakes



"Assuming an average of 30 hands per hour, a player would have to play more than 46.6 hours with no breaks" to reach that number of hands.  Gov't Expert Report at 9.

Third, Dr. DeRosa argued that the presence of persistent winners and losers, as illustrated by Dr. Heeb's chart (shown as Figure 1, *supra*) does not prove that skill predominates over chance in poker, because "persistent winners and losers (selected after the fact) result normally from random chance variation." *Id.* at 11.

> If one were to chart the performance of players involved in a game whose outcome was determined by purely by chance, one might expect to see similar results.  Some players are seen—after the fact—to have consistently won.  This does not prove or disprove that their winning was a result of skill.

*Id.* at 12.  To demonstrate this point, Dr. DeRosa ran a simulation that produced results similar to having 1,000 players each flip a coin 100,000 times.  *Id.*  As with a coin flip, each player had "an equal chance of either winning or losing an equal amount of money on any given trial."  *Id.*  As shown below in Figure 7, his results appear strikingly similar to those of Dr. Heeb in Figure 1.



Fig. 7: Simulated Cumulative Winnings of Top 10 Winners and Losers (1,000 players, 100,000 trials each)

According to Dr. DeRosa, "[t]his experiment shows that in a game of pure chance, in the long run, the top winners exhibit the behavior of persistently winning while the top losers appear to be consistently losing."  Gov't Expert Report at 13; *see also* Gov't Reply Letter at 3-4; Figure 1 and accompanying text, *supra*.

Finally, Dr. DeRosa questioned the validity of Dr. Heeb's data set, as well as his methodology.  Since the data came from an online poker website, Dr. DeRosa was concerned that it might not represent "real hands played by real players" and might include false data points representing instances in which live players—who may have believed that they were playing against another, similarly-situated person—were playing against either a computer or a confederate of the gaming company.  *See id.* at 17; Gov't Expert *Daubert* Hr'g 32:5-10; 73:22 – 74:20; *see also* Gov't Reply Letter at 10 ("It should be noted that Dr. Heeb admitted that he never performed any test to determine whether players were colluding or had more information than they should have had (such as knowing what the community cards would be before they were dealt).  In a game based on imperfect information, knowledge of even a single card, whether held by an opponent or included in the community cards[,] would be massively valuable.").  He also questioned Dr. Heeb's decision to categorize "[p]layers with too few hands played to calculate statistics for all the various hand and position combinations" as "the lowest skill level" in his analysis of whether skilled players played particular hands better than unskilled players.  Def. Expert Report at 36 n.7.  According to Dr. DeRosa:

> These players could be 'skilled' players who only played a few . . . hands and then quit because they were losing. . . . The assumption . . . could cause a self-serving bias in Dr. Heeb's analysis.  A player only plays a few hands because he loses.  He is then assumed to be unskilled and therefore the expected loss of unskilled players increases.

Gov't Expert Report at 16.

Dr. DeRosa concluded that Dr. Heeb has not proven that skill predominates over chance in poker. Gov't Expert Report at 3. He did not discuss Dr. Heeb's analysis of the relative performance of skilled versus unskilled players in playing the same hand. *See* Fig. 2-3, *supra*, and accompanying text.


c. **Defense Expert's Supplemental Report**

Following the August 10, 2012 *Daubert* hearing, Dr. Heeb submitted a supplemental expert report responding to Dr. DeRosa's critiques and providing additional support for his conclusion that skill predominates over chance in poker. *See generally* Def. Expert Supp. Report.

First, Dr. Heeb argued that his definition of skill, and his evaluation of relative skill levels, was appropriate. He conceded that only "10 percent to 20 percent of the players in any given game are good enough to win consistently . . . . And that's represented by the top 6 to 8 percent of players on" Figure 4, *supra*. Gov't Expert Daubert Hr'g Tr. 86:5-9. He contested the view, however, that poker players can only demonstrate skill by winning money. Instead, as Dr. Heeb put it, "the question of whether skill predominates requires only an examination of the relative importance of skill." Def. Expert Supp. Report at 1. Moreover, he added, "[a] big part of the reason that more poker players have losing results than have winning results on a cumulative basis is that in most circumstances, including the data I studied, player pay a fee to the operator of a poker game in the form of a 'rake,' which is a small percentage deducted from each pot." *Id.* at 2. To demonstrate this, Dr. Heeb adjusted Figure 4, *supra,* to add the rake payments back to the players' winnings. In his initial analysis, which included the payment of the rake, as shown in Figure 4, only 28% of players in the $5/$10 game have a positive profit

over the course of a year. When the rake is added back, 37% of players have a positive profit, as shown in Figure 8. As before, win rate is calculated as fraction of the big blind won per hand, on average.



Fig. 8: Average win rates for players of different predicted skill, for $5/$10 stakes, adding rake back in player results

40

Dr. Heeb further explained that "[t]he reason that less than half the players earn a profit is that the best players (with or without the rake) win more than their pro-rata share of the profits, so there are fewer winners than losers." *Id. But see* Gov't Reply Letter at 2 ("[A]nalyzing the data without the rake is misleading because poker is a game where winning or losing is determined by monetary performance in an absolute sense. Unlike games such as chess or golf, wagering money is an integral part of a poker game. Whether a player is successful depends on how much money he has won or lost, but by how well he has faired against the other players.")/

Dr. Heeb also defended his assignment of players who play very few hands to the low skill group, explaining that, in his experience as a poker player, "players who play only a few hands and quit"—even if they win money before leaving the game, as some do—"are almost always low skill players." *Id.* at 7. He noted that, because "the outcome of players' hands are effectively weighted by the number of hands that they played, . . . a player who played only a few hands would get very little weight in the simulation." *Id.*

Second, Dr. Heeb explained his reliance on cumulative results, and particularly his dependence on results involving large numbers of hands played:

> In order to assess whether poker is a game in which skill predominates, it is essential to consider the cumulative outcome after a sufficient number of hands. Consider baseball or gold. Baseball is a game of skill on every pitch, even those pitches on which something "lucky" or "unlucky" happens. Nonetheless, it would not be possible to determine with statistical confidence that baseball is a game of skill from a single pitch, or even a single game, even though the score is known and can change with each pitch. Similarly, each stroke in gold can change the score. Poker is a game of skill on every hand that is played, but proving this statistically requires a sufficient number of hands. . . .
>
> . . . Typical poker players, even in social games, play multiple sessions at regular intervals, such as playing once or twice weekly. Even after only an eight-hour session of poker (about 240 hands), skillful play can already be distinguished from less skillful play. . . . [When the 50% most skilled players are compared to the 50% least skilled players] 76% of higher skill players are already ahead after just 240 hands. If I focus on the top 10% of players, compared with the bottom

30% of players, 88% are ahead after just 240 hands.  More than 90% are ahead after just 300 hands.

This number of hands can easily be played in a single session of poker, even by casual players in a social game. . . . A serious poker player, even an amateur, can easily play thousands of hands a month in live play.

*Id.* at 3-4.  *See also* Gov't Expert *Daubert* Hr'g Tr. 78:22 – 79:22 ("Dr. Heeb: . . . [I]f I look over a large number of plays, a large number of a statistical sample, what I learn from the sample after enough observations is arbitrarily close to the absolute truth. And it's just a question of how many you have to look at to know what the true underlying distribution or any underlying statistic would be. So depending on how closely you want to know the truth, you may have to look at more and more -- a larger and larger sample, more and more observations. But the underlying truth hasn't ever changed. So we're trying to detect whether or not this is a game of skill with a degree of precision . . . . After enough information, we can determine that the probability of players getting different results, the skillful players' better results, the less skillful players' less successful results, the probability of that happening by anything other than a difference in skill between the players becomes . . . smaller and smaller the more observations on the data, the more hands that we play. It's still a game of skill even on one hand. But to say that we have shown that with statistical certainty requires more and more information the more precisely we want to measure it."); *see id.* 77:20 – 78:6 ("Dr. Heeb: The way that I would think about it is that the question is whether or not the game is a game of skill. How many hands do you need to look at in order to discern that with statistical certainty? A more familiar example might be baseball. One pitch in baseball is a skillful event, both skillful by the pitcher and skillful by the hitter. If you wanted to demonstrate that skill, you would look at a lot of pitches, games, for the season. And based on a statistical analysis of a lot of events, you would be able to

determine whether or not that was a skillful act. But it's a skillful act in the execution of just one swing or one pitch.").

Third, Dr. Heeb provided additional charts and calculations to support his contention that winning persists in poker, and that the trends shown in Figure 4 are the result of skill rather than chance. He showed that, in general, winning players persisted in winning, and losing players persisted in losing, prospectively—i.e., after they had been identified as winners and losers. Def. Expert Supp. Report at 4-5. The same was not true for players in a pure game of chance, such as the coin toss modeled by Dr. DeRosa in Figure 7, *supra*. Dr. Heeb concluded that "[t]his clearly demonstrates that it is the relative skills of these [poker] players and not chance that is leading to their winning and losing. . . . The contrast between [the performance of poker players and coin tossers] illustrates the degree to which skill is predominant over chance." *Id.* at 5.

Finally, Dr. Heeb calculated the relative proportions that skill and chance contribute to the outcome of poker. He explained his methodology as follows:

> If the proportion of the game attributable to skill is 0%, then the probability of prevailing should be the same for all contestants. As a result, in a matchup of a "higher skilled" and a "lower skilled" player in a game in which skill contributes 0% to the outcome, the "higher skilled" player will win about 50% of the time. If the proportion of skill in the game is 100%, then a perfectly skilled contestant would win 100% of the time. However, even in a game of 100% skill, the more skillful player could make an error, leading to a win by the less skillful player. If skill and chance are equally important, and therefore equally likely to contribute to the probability of prevailing, then half the time skill is decisive, and half of the time chance is decisive. When skill is decisive, the skillful contestant wins. When chance is decisive, the players have an equal probability of winning. This implies that a contest between two players or teams that is exactly 50% skill and 50% chance will result in the skillful contestant winning 75% of the time. Of course, the poker games I studied were not two player games, but the experiment that I conducted pitted a group of more skilled players against a group of less skilled players, so this is the appropriate measure to use.

*Id.* at 8.

As "the proper duration of a test of the fraction of skill and chance in any game must be a function of the game itself," Dr. Heeb chose several benchmarks that were representative of different kinds of game play, ranging from a social game to the world championship contest.

An eight hour poker session, typical of some social games, would involve about 240 hands, since in an hour of live play, players will play about 30 hands. A typical poker day at a poker tournament would last ten hours, excluding breaks, and involve about 300 hands. Events at the World Series of Poker last three, ten-hour days, for a total of about 900 hands of play. The winner of the World Series of Poker's main event is widely recognized as the world champion. That event is conducted over ten days, so the poker World Champion is crowned after about 3,000 hands.

*Id.* at 9. The formula relied upon by Dr. Heeb is as follows:

$$P(W|H) = PS * P(W|S,H) + PC * P(W|C,H)$$
$$= PS * P(W|S,H) + (1\text{-}PS) * P(W|C,H)$$
$$= PS * 1 + (1\text{-}PS) * 0.5$$
$$= 0.5 + 0.5PS$$

Where:
P(W|H) = Probability of Winning for the High Skill Player
PS = Portion of the Game Contributed By Skill
PC = Portion of the Game Contributed By Chance
P(W|S,H) = Probability of Winning if Skill is Decisive, for the High Skill Player
P(W|C,H) = Probability of Winning if Chance is Decisive, for the High Skill Player

*Id.* at 8.

Using this formula, he compared the performance of the top 10% of players to the bottom 30% of players in a $5/$10 stake game, and the performance of the top 50% of players to the bottom 50% of players based upon $1/$2 stakes, at these benchmarks. *Id.* at 10. In as few as 240 hands, skill accounted for more than 50% of the outcome in the games.

Fig. 9: Contribution of skill to poker

| Relative skills | Number of hands played | High skilled win % | Contribution of skill % |
|---|---|---|---|
| Top 10% versus bottom 30% ($5/$10 game) | 240 | 88% | 77% |
| | 300 | 91% | 81% |
| | 900 | 99% | 98% |
| | 3,000 | 99% | 99% |
| Top 50% versus bottom 50% ($1/$2 game) | 240 | 76% | 51% |
| | 300 | 78% | 57% |
| | 900 | 90% | 81% |
| | 3,000 | 99% | 98% |

Dr. Heeb opined, "[T]he above analysis establishes that skill in poker predominates over chance overwhelmingly, based on a standard of 3,000 hands of play. If the Court were to rule using a benchmark involving fewer hands of play, under all benchmarks proposed above, poker is a game in which skill predominates over chance." *Id.* The government contests the conclusions Dr. Heeb draws from this chart, but not the calculations themselves. *See* Gov't Reply Letter at 8-10.

### 4. **Other Evidence**

A number of other studies were properly relied on by the defendant without objection, providing additional empirical support for the fact that skill determines the outcome in poker. *See* Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.").

One study found, in an analysis of 103 million hands of Texas Hold'em poker, that seventy-five percent of poker hands conclude when one player bets and induces his opponents to

fold; the cards are never revealed or compared.  *See* PPA Mot. for Leave to File an Amicus Br.

Ex. A (Paco Hope & Sean McCulloch, Statistical Analysis of Texas Hold'em 6 (Mar. 4, 2009)

(unpublished article)), Doc. Entry 74, July 3, 2012.  In the remaining hands, at least half the time

the player who would have had the best hand does not win because he has folded.  *Id.*  The

authors concluded that "in the sampled data, the vast majority of games are determined by

something other than the value of the cards, since no player reveals any cards to determine the

winner." *Id.* at 14.

Other studies have found that skilled players defeated unskilled players both in

simulations and in real-world play.  *See* PPA Mot. for Leave to File an Amicus Br. Ex. B (Noga

Alon, Poker, Chance and Skill 15-16 (unpublished manuscript)), Doc. Entry 74, July 3, 2012

(concluding, based on analysis of a simplified model of poker, that "although like in essentially

almost any other game there is some influence of chance in poker, the game is predominantly a

game of skill," and that "the significance of skill increases dramatically as the number of hands

played grows"); PPA Mot. for Leave to File an Amicus Br. Ex. C (Rachel Croson, Peter

Fishman, & Devin G. Pope, *Poker Superstars: Skill or Luck? Similarities between golf—thought

to be a game of skill—and poker*, Chance, vol. 21, no. 4 (2008)), Doc. Entry 74, July 3, 2012

(comparing the effect of chance and skill on golf and poker and concluding that poker is as much

a game of skill as golf); PPA Mot. for Leave to File an Amicus Br. Ex. D (Steven D. Levitt &

Thomas J. Miles, The Role of Skill Versus Luck in Poker: Evidence from the World Series of

Poker 12-14 (May 2011) (unpublished manuscript)), Doc. Entry 74, July 3, 2012 (finding, based

on an analysis of data from the 2010 World Series of Poker, that "[p]layers classified as high

skill [based on past performance in other tournaments] are 12 percent more likely to make

money than the average player, and 19 percent more likely to make the final table" and that "in

some crude sense, the predictability of outcomes for pairs of players in a poker tournament is similar to that between teams in Major League Baseball").

The government counters that "expert poker players recognize the critical role that luck plays in the game." Gov't Mem. of L. in Opp. to Def.'s Rule 29 Mot. 31, Doc. Entry 96, July 27, 2012. For example, one professional poker player, Phil Gordon, has observed, "Change ten river cards [i.e., the final card dealt in any Texas Hold'em hand] in any poker player's tournament career, and I would bet that they would be a losing tournament player for their career." McManus, *supra,* at 342. Similarly, Dan Harrington, a prominent and accomplished expert poker player, has acknowledged, "The volatility in [no-limit Texas Hold'em] tournaments is out of sight . . . Sure, you see some names repeating as winners. They are truly great players. But the problem is, there are lots of other truly great players you haven't seen at all. And it's not because they are paying badly. It's the variance. You need to be extremely lucky." *Id.* at 343.

The government also contests the conclusions the defendant draws from one of the studies cited. It contends that "the fact that [most poker] players fold" before the showdown "demonstrates that chance is the dominant factor in poker. Every decision a player makes is a reaction to a chance event (the random distribution of cards) or another player's reaction to a chance event over which the player has no control." Gov't Reply Letter at 6.

### 5. **Conclusions of Other Courts and the States**

Whether poker is a game of chance or a game of skill is a matter of some public and judicial debate. *See, e.g.,* DeeDee Correll, *Taking their chances on poker's legality: Is Texas Hold'em about the luck of the draw, or the skill of the player? The question is being played out in courts around the country*, L.A. Times, Sept. 3, 2009, at 14.

When the first wave of anti-gambling laws was passed by state legislatures across the country in the nineteenth century, they frequently prohibited poker along with other gambling activities. McManus, *supra,* at 83-84.  In early cases, poker players were described as "gamblers," and poker was described as "gambling."  *See, e.g., Utsler v. Territory*, 62 P. 287, 288 (Ok. 1900) (upholding defendant's conviction under state statute making it "unlawful for any dealer in intoxicating liquors in this territory to have or permit any gambling, game of chance, or gambling carried on, or to have or keep any gambling table or gaming device of any kind, in a room where intoxicating liquors are sold" and noting that the witness McKay and "[t]he witness Fisher . . . testified that [they] saw gambling carried on in the room with cards, being known as 'stud poker,' and he also testified that liquor was sold in the same room"); *In re Selling's Estate*, 2 N.Y.S. 634, 635 (1888) (denying respondent the right to administer the estate of a deceased on the grounds that "[t]he proof submitted by the petitioner also shows the respondent Joseph Selling to be a man of utterly worthless and irresponsible character; that he is a professional gambler, know[n] as 'Poker Joe'").

Several state gaming laws explicitly include "poker"—apparently including Texas Hold'em—in their definition of gambling or define it as a game of chance.  *E.g.* Wis. Const. Art IV, § 24(6)(c) (prohibiting the legislature from authorizing particular games as a state-run lottery, including poker); Idaho Const. Art III § 20(2) (prohibiting casino gambling, including poker); Ark. Code § 5-66-112 (prohibiting betting money or something of value on card games, including "poker"); Conn. Gen Stat. § 53-278a(2) ("'Gambling' means risking any money, credit, deposit or other thing of value for gain contingent in whole or in part upon lot, chance or the operation of a gambling device, including the playing of a casino gambling game such as . . . poker."); Ohio Rev. Code Ann. § 2915.01 ("'Game of chance' means poker, craps, roulette, or

48

other game in which a player gives anything of value in the hope of gain, the outcome of which is determined largely by chance, but does not include bingo."); Idaho Code § 18-3801 (defining gambling as including poker and excluding "[b]ona fide contests of skill, speed, strength or endurance in which awards are made only to entrants or the owners of entrants"); Iowa Code § 99B.11 ("A poker, blackjack, craps, keno, or roulette contest, league, or tournament shall not be considered a bona fide contest" of skill exempt from gambling license requirements; "[c]ribbage, bridge, chess, checkers, dominoes, pinochle and similar contests, leagues or tournaments" are exempted.); Okla. Stat. tit. 21 § 941 ("Except as provided in the Oklahoma Charity Games Act, every person who opens, or causes to be opened, or who conducts, whether for hire or not, or carries on . . . poker . . . for money, checks, credits, or any representatives of value, or who either as owner or employee, whether for hire or not, deals for those engaged in any such game, shall be guilty of" opening, conducting or carrying on gambling game.); Tenn. Code Ann. § 39-17-501, Sentencing Commission Comments ("The definition of 'gambling' includes . . . poker."); *cf.* Cal. Penal Code § 337j(e) (including poker in the definition of a controlled game which is unlawful to operate without a license except when played "in private homes or residences, in which no person makes money for operating the game, except as a player"). Others implicitly include poker in their definition of gambling. *See* Fla. Stat. §§ 849.08 - 849.085(2)(a) (prohibiting "any game at cards, keno, roulette, faro or other game of chance, at any place, by any device whatever, for money or other thing of value" but stating that gambling on poker is not a crime when played for "penny ante"); *id.* § 849.086(1) (authorizing poker games at racetracks if those games are played in compliance with Florida law); Mich. Comp. Laws Ann. § 750.314 (making it unlawful for any person "by playing at cards . . . or by betting or putting up money on cards . . . [to] win or obtain any sum of money or any goods").

State courts which have ruled on the issue are divided as to whether poker constitutes a game of skill, a game of chance, or a mixture of the two. *See* Cabot & Hannum, *supra,* at 456-64 (surveying state court decisions); Bennett M. Liebman, *Poker Flops Under New York Law*, 17 Fordham Intell. Prop. Media & Ent. L.J. 1, 19-21 (2006) ("[M]ost courts find that poker is a game of chance. . . . [E]ven the jurisdictions that recognize the great level of skill involved in playing poker nonetheless conclude that the degree of chance involved in the playing of the game renders poker an activity constituting gambling."). *Compare Garrett v. Alabama*, 963 So. 2d 700, 700-01 (Ala. Crim. App. 2007) (unpublished) (affirming decision that poker is a game of chance); *Indoor Recreation Enterprises, Inc. v. Douglas,* 235 N.W.2d 398, 401 (Neb. 1975) (holding that poker and bridge are predominately games of chance); *Joker Club, L.L.C. v. Hardin,* 643 S.E.2d 626, 629-31 (N.C. Ct. App. 2007) (holding that poker is a game of chance under the predominate factor test); *and Commonwealth v. Dent,* 992 A.2d 190, 196 (Pa. Super. 2010) (applying predominate factor test and finding that Texas Hold'em is a game of chance); *with Charnes v. Cent. City Opera House Ass'n*, 773 P.2d 546, 551 (Colo. 1989) (holding that, although card games played at an event, including poker, do require skill, it also involves an element of chance, and that this element is sufficient to qualify it as gambling under state law); *State ex rel. Schillberg v. Barnett*, 488 P.2d 255, 257-59 (Wash. 1971) (same); *and* PPA Mot. for Leave to File an Amicus Br. Ex. E (*Town of Mount Pleasant v. Chimento*, No. 98045DB (Mt. Pleasant (S.C.) Muni. Ct. Feb. 19, 2009), Doc. Entry 74, July 3, 2012 (stating that poker is a game of skill but nevertheless finding defendants guilty of a state gambling offense since that criteria was not clearly relevant to state law definition of gambling), *appeal filed,* No. 2009-CP-10-001551 (S.C. Ct. App. Oct. 1, 2009). *Cf. State v. Coats*, 74 P.2d 1102 (Or. 1938) ("Poker, when played for money, is a gambling game, but, since it involves a substantial amount of skill

and judgment, it cannot reasonably be contended that it is a lottery."). *But see* Def.'s Letter Reply to Gov't Aug. 17, 2012 Letter 1, Doc. Entry 108, Aug. 20, 2012 (citing foreign cases finding that poker is a game of skill).

Many states which do not explicitly include poker in their definition of gambling have nevertheless found that poker is gambling. *See, e.g., Garrett*, 963 So. 2d at 700 (holding that poker is covered by a state gambling statute); *State v. Duci*, 727 P.2d 316, 319 (Ariz. 1986) (holding that poker is covered by a state gambling statute which defines gambling as betting on the result of any game of skill or chance); *People v. Mitchell*, 444 N.E. 2d 1153, 1155 (Ill. App. Ct. 1983) (same); *State v. Schlein*, 253 Kan. 205, 305 (1993) (holding that a location which hosts a poker tournament is a "gambling place" under state law "and an individual who enters the premises where gambling is occurring, with the intent to participate in the poker tournament, has entered into a gambling place"); *Joker Club LLC*, 643 S.E. 2d at 630-31 (holding that poker is gambling under state law); *Dent*, 992 A.2d at 196 (same); *Barnet*, 488 P.2d at 258 (same); *cf. Emerson v. Townsend*, 73 Md. 224 (1890) (money loaned for poker was loaned for "gambling").

Federal courts have generally treated poker as a game of chance and characterized it as gambling. *See, e.g., Johnson v. Collins Entm't Co., Inc.*, 199 F.3d 710, 720 (4th Cir. 1999) ("The regulation of lotteries, betting, poker, and other games of chance touch all of the above aspects of the quality of life of state citizens."); *Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024, 1027 n.5 (2d Cir. 1990) ("The games of chance that Connecticut permits at the 'Las Vegas nights' include blackjack, poker, dice, money-wheels, roulette, baccarat, chuck-a-luck, pan game, over and under, horse race games, acey-ducey, beat the dealer, and bouncing ball."); *Percifield v. United States*, 241 F.2d 225, 226 (9th Cir. 1957) ("[A]ppellant operated a gambling casino at Rangely, Colorado, known as the Ace-High Club. This contained a bar, a lounge, a

cafe, and a casino room where games of chance were played, including blackjack or '21', poker, craps or dice, as well as slot machines."); *Mich. Gambling Opposition v. Norton*, 477 F. Supp. 2d 1, 19 (D.D.C. 2007) ("Class II gaming [under the Indian Gaming Regulatory Act, *see* Part V(B)(3)(a), *infra*] includes games of chance such as bingo or poker."); *Valley Broadcasting Co. v. United States*, 820 F. Supp. 519, 522 (D. Nev. 1993) ("Plaintiffs desire to broadcast commercials related to legal gaming activities located in Nevada such as blackjack, craps, poker, roulette, slot machines, and other lawful games of chance."); *cf. United States v. Gotti*, 459 F.3d 296, 342 (2d Cir. 2006) (finding that Joker Poker machines were gambling devices under New York law based upon their similarity to poker, as the defendant "concedes that the games in question had the theme of poker, and he has not contended in his brief that chance does not play a material role in the outcome of a poker game"), *cert. denied sub. nom.*, *Ciccone v. United States*, 551 U.S. 1144 (2007).

### 6. **Compared to Video or "Joker" Poker**

Courts have also been asked to rule on the legality of activities involving video or "Joker Poker" machines.  "A video poker machine is an electronic device with a video screen at the top and buttons to operate its functions. The object of playing a video poker machine is to obtain the best poker hand possible on the video screen. The machine awards points for winning poker hands."  *United States v. Conley*, 92 F.3d 157, 159 n.1 (3d Cir. 1996).  While game play on these mechanical devices is somewhat similar to playing "live" poker, "video poker machine gambling entails less skill and hence more chance." *United States v. Conley*, 859 F. Supp. 864, 869 (W.D. Pa. 1994) (referencing the affidavit of an FBI agent), *aff'd, Conley*, 92 F.3d 157; *see also United States v. 294 Various Gambling Devices*, 718 F. Supp. 1236, 1243 (W.D. Pa. 1989) ("[A]ll the skill elements associated with the ordinary game of draw poker are conspicuously absent in the

video version. In video poker there is no raising, no bluffing, no money management skills. The player's only skill is to recognize possible combinations and basic statistical probabilities. . . . Even a player with minimal experience can discard the least desirable cards and retain those cards which provide the greatest likelihood for a winning combination, but the cards drawn are produced at random and only chance determines whether a player wins or loses. Furthermore, even this limited skill element is countered in the long run by what is called a retention ratio. Over time the video poker machine is programmed to retain a set percentage of all credits played, so that over the long haul even the astute player cannot defeat the retention ratio."). Unlike live poker or internet poker, video poker is house-banked; players play against the machine (the house) rather than other players.

### C. **Evidence at Trial**

The essential facts of the case are largely undisputed. The defendant, in partnership with two others, operated a poker club in the back room of a warehouse out of which he conducted a legitimate business selling electric bicycles. Tr. of Trial 277:12 – 281:19 (Testimony of Jacek Meckelberg), July 10, 2012. Games were generally held on Mondays and Thursdays, *see, e.g.* Tr. of Trial 47:9-10 (Testimony of Joseph George Monteleone), July 9, 2012, although there was some evidence to suggest that this schedule was not adhered to with full regularity. Tr. of Trial 305:8-23 (Testimony of Jonathan Seda), July 10, 2012 (indicating that sometimes there were not enough players to get a poker game started). Games were advertised via word-of-mouth and text messages sent to potential participants by the partnership. *E.g. id.* 63:7-12 (Testimony of Joseph George Monteleone). The club contained two tables, at which No Limit Texas Hold'em was played. *Id.* 57:23 – 58:1 (Testimony of Joseph George Monteleone). A "1-2" game was played at one of the tables; a "5-5" game was played at the other. *Id.* In a 5-5 game, one designated

53

player would have to bet $5 (the "small blind"), and another designated player would have to bet $5 (the big blind), regardless of what cards they held in their hand. *Id.* 32:17 – 33:10. In the 1-2 game, the small blind was $1, and the big blind was $2. *Id.* 58:2-5. The average amount of chips purchased by the players, or "buy-in," ranged from $100 for the 1-2 game, Tr. of Trial 182:6-8 (Testimony of Deborah Berardi), July 10, 2012, to $300 for the 5-5 game, *Id.* 182:9-10 (Testimony of Deborah Berardi). *See also* Tr. of Trial 58:7-12 (Testimony of Joseph George Monteleone), July 9, 2012 (stating that the average buy-in for the 1-2 game was $100-300); *id.* 303:15-19 (Testimony of Jonathan Seda) ("A. If it was a one-two game, the minimum buy-in would be 60 bucks. The max you can come into the game with is 300. Q. Was there a bigger table, as well? A. Rarely. If it was, it was a five-five, and I think the max would be like 500."). Games could last as long as eight hours. Tr. of Trial 47:7-8 (Testimony of Joseph George Monteleone), July 9, 2012 ("Q: And about how many times did you gamble [at the defendant's establishment]? A: From December of 2010 'til February 2011 twice a week."); *id.* 59:12-21 ("Q: When did you typically arrive when you played games at [the defendant's establishment]? A: Usually, give or take, 10:00 p.m. Q: How long did you typically play? A: Four to five hours. Usually, I would leave around 2:00, between 2:00 and 3:00 a.m. Q: Was the game breaking up when you left? A: No. Q: Do you know when it ended? A: Various nights, 6:00, 6:00 a.m., 7:00 a.m.").

Players were plied with free food and drinks by a waitress to induce them to stay and play longer. *E.g.* Tr. of Trial 96:12-17 (Testimony of UC4783), July 9, 2012. A five percent "rake" for the house was collected by the dealers from each pot. *Id.* 105:15-20. Dealers were paid twenty-five percent of the rake. Tr. of Trial 317:8-11 (Testimony of Jonathan Seda), July 10,

2012.  The remaining funds from the rake were used for expenses relating to the operation of the business and for profits.  *See id.* 322:17 - 323:3; *id.* 284:24-25 (Testimony of Jacek Meckelberg).

Other than the operation of these games, no unlawful conduct by the defendant—such as money laundering or loan-sharking—was shown.  No connection to organized crime was suggested.

III.  **Federal Rule of Criminal Procedure 29**

Under Federal Rule of Criminal Procedure 29, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. Rule 29(a).  Decision may be reserved until after the jury returns a verdict of guilty.  *Id.* 29(b).

A defendant challenging his conviction on the basis of the insufficiency of evidence "bears a heavy burden." *United States v. Henry,* 325 F.3d 93, 103 (2d Cir. 2003).  His conviction must be affirmed if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Florez*, 447 F.3d 145, 154 (2d Cir. 2006) (emphasis in original). The evidence must be viewed in the light most favorable to the government.  *United States v. Pizzonia*, 577 F.3d 455, 462 (2d Cir. 2009).

Even though the rule speaks only of insufficiency of *evidence*, it obviously covers a case where the alleged or proved conduct does not violate the statute charged.  "In a criminal case, a failure of the indictment to charge an offense may be treated as a jurisdictional defect." *United States v. Foley,* 73 F.3d 484, 488 (2d Cir.1996), *overruled in part on other grounds, Salinas v. United States,* 522 U.S. 52 (1997).  A court will grant a motion under Rule 29 where the conduct does not constitute a crime.

IV. **Rules of Statutory Construction**

    A. **Generally**

"[S]tatutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *United States v. Albertini,* 472 U.S. 675, 680 (1985); *see also, e.g. United States v. Piervinanzi,* 23 F.3d 670, 677 (2d Cir. 1994). Where a term in a criminal statute is undefined, courts resort to dictionaries to determine its "ordinary meaning." *See, e.g., United States v. Santos,* 553 U.S. 507, 511 (2008) (plurality op.) (relying on the Oxford English Dictionary, the Random House Dictionary of the English Language, and Webster's New International Dictionary to define the term "proceeds"); *see also United States v. Broxmeyer,* 616 F.3d 120, 125 (2d Cir. 2010) (consulting the Random House Dictionary of the English Language to determine the meaning of "persuade," "induce," and "entice"; although these terms were not defined in the statute, they are "words of common usage that have plain and ordinary meanings"). Should Congress use a common-law term in a statute, it is assumed that the "term . . . comes with a common law meaning, absent anything pointing another way." *Safeco Ins. Co. of America v. Burr,* 551 U.S. 47, 58 (2007). "The meaning of doubtful terms or phrases may [also] be determined by reference to their relationship with other associated words or phrases." *United States v. Dauray,* 215 F.3d 257, 260, 262 (2d Cir. 2000). Moreover, "where general words" are accompanied by "a specific enumeration of persons or things, the general words should be limited to persons or things similar to those specifically enumerated." *Id.* When the plain language and canons of statutory interpretation fail to resolve statutory ambiguity, reference will be made to legislative history. *See, e.g., Lee v. Bankers Trust Co.,* 166 F.3d 540, 544 (2d Cir. 1999).

B.  **Rule of Lenity**

Interpretation of criminal statutes is guided by unique considerations.  As the Supreme

Court has explained:

> Although it is not likely that a criminal will carefully consider the text of the law
> before he murders or steals, it is reasonable that a fair warning should be given to
> the world in language that the common world will understand, of what the law
> intends to do if a certain line is passed. To make the warning fair, so far as
> possible the line should be clear.

*McBoyle v. United States*, 283 U.S. 25, 27 (1931).  If a criminal statute remains unclear even

when viewed in context, "[t]he rule of lenity requires ambiguous criminal laws to be interpreted

in favor of the defendants subjected to them." *Santos*, 553 U.S. at 514.  The Supreme Court

declared:

> This venerable rule not only vindicates the fundamental principle that no citizen
> should be held accountable for a violation of a statute whose commands are
> uncertain, or subjected to punishment that is not clearly prescribed. It also places
> the weight of inertia upon the party that can best induce Congress to speak more
> clearly and keeps courts from making criminal law in Congress's stead.

*Id.*

While questions of burdens of proof generally apply to factual matters, the rule of lenity,

in essence, places a burden of proof on the government with respect to statutory interpretation.

In order to prevail, the government must show that it is more probable than not that the meaning

that it relies upon is the appropriate interpretation of the statute.  A state of equipoise on the

issues requires favoring the defendant's view.  *See id*. at 513-14 (stating that, where two

competing definitions of a critical statutory term are equally plausible, "the tie must go to the

defendant").  The government bears the burden of proving by a preponderance standard any

factual propositions that underlie its interpretation of the statute.

The rule of lenity "is especially appropriate in construing . . . predicate offenses under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961(1) (1994 ed., Supp. IV)," such as illegal gambling under the IGBA. *Skilling v. United States*, 130 S. Ct. 2896, 2932 (2010).

A statute in not "'ambiguous' for purposes of lenity merely because it [i]s possible to articulate a construction more narrow than that urged by the Government." *Moskal v. United States,* 498 U.S. 103, 108 (1990). Lenity is "reserved . . . for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to 'the language and structure, legislative history, and motivating policies' of the statute." *Id.* (quoting *Bifulco v. United States,* 447 U.S. 381, 387 (1980)). It is a "doctrine of last resort." *United States v. Hescorp, Heavy Equip. Sales Corp.,* 801 F.2d 70, 77 (2d Cir.1986); *see also United States v. Granderson,* 511 U.S. 39, 54 (1994) (applying the rule of lenity "where text, structure, and history fail to establish that the Government's position is unambiguously correct").

## V. Federal Gambling Laws

### A. Illegal Gambling Business Act

#### 1. Statutory Language

Close reading of the IGBA reveals that it requires both a violation of an applicable state law and proof of additional federal elements. The IGBA provides, in pertinent part, that:

> **(a)** Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both.
> **(b)** As used in this section--
> **(1)** "illegal gambling business" means a gambling business which--

(i) *is a violation of the law of a State* or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; *and*

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) *"gambling" includes but is not limited to* pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

. . .

(e) This section shall not apply to any bingo game, lottery, *or similar game of chance* conducted by an organization exempt from tax under paragraph (3) of subsection (c) of section 501 of the Internal Revenue Code of 1986, as amended, if no part of the gross receipts derived from such activity inures to the benefit of any private shareholder, member, or employee of such organization except as compensation for actual expenses incurred by him in the conduct of such activity.

18 U.S.C. § 1955 (emphasis added).

The structure of the IGBA is similar to that of RICO, which was passed as part of the same act. *See* Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922 (codified in scattered sections of the U.S.C.). While the IGBA "declar[es] that certain gambling activities violate federal as well as state law," *Iannelli v. United States,* 420 U.S. 770, 788 (1975), it does not merely federalize state gambling crimes. In order to run afoul of the IGBA, the defendant must operate an "illegal gambling business" as defined by federal law. *See Sanabria v. United States*, 437 U.S. 54, 70 (1978) (holding that, although a "gambling business" may violate multiple provisions of state law, the "allowable unit of prosecution" under the statute for the purposes of double jeopardy is participation in a particular "gambling business"). To show that the defendant did so, the government must prove not only that the gambling activities conducted by the business violated state law, 18 U.S.C. § 1955(b)(1)(i), but also two additional, uniquely

federal elements. *Id.* § 1955(b)(1)(ii)-(iii); *see also Sanabria*, 437 U.S. at 70 ("Congress did not assimilate state gambling laws *per se* into the federal penal code, nor did it define discrete acts of gambling as independent federal offense."). These elements—that the business must (1) include five or more employees, § 1955(b)(1)(ii), and (2) be in operation for thirty days or earn more than $2,000 in one day, § 1955(b)(1)(iii)—limit the reach of the statute to enterprises of a particular size. Thus, even if poker were to constitute gambling under the IGBA, most "kitchen table" poker games would not satisfy either or both of these requirements.

The IGBA does not define the federal component of gambling precisely. Though games of chance run by tax exempt organizations are excluded from prosecution under § 1955(e), § 1955(b)(2) makes no mention of chance, skill, or any other characteristic defining gambling. While it enumerates a list of activities that constitute gambling, this list is not exclusive. *See Organized Crime Control: Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 91st Cong. 325 n.66 (1970) (hereinafter "*House Judiciary Hr'gs*") (Committee on Federal Legislation, The Association of the Bar of the City of New York, The Proposed Organized Crime Control Act of 1969 (S. 30) (1970)) ("The term 'gambling' is said to 'include' certain specified activities . . . without indicating whether the list is supposed to be all-inclusive."). Nor does the statute explicitly state how this list of gambling activities in subsection (b)(2) relates to the crime of running an illegal business as defined by subsection (b)(1). Resort to techniques other than plain meaning is necessary to determine the meaning of the term and its relation to the rest of the statute.

## 2. **Dictionary Definitions**

Dictionary definitions of gambling vary widely. Some broadly include "play[ing] a[ny] game for money or property." *Gamble*, Merriam-Webster Online Dictionary,

http://www.merriam-webster.com/dictionary/gamble (last visited July 10, 2012); *see also*

*Gambling*, Black's Law Dictionary 748 (9th ed. 2009) ("The act of risking something of value,

esp. money, for a chance to win a prize.").  Others define gambling as limited to playing games

of chance for money.  *Gamble,* The Oxford English Dictionary (2d ed. 1989) ("To play games of

chance for money, *esp.* for unduly high stakes; to stake money (*esp.* to an extravagant amount)

on some fortuitous event."), *available at* http://oed.com/view/Entry/76447; *Gambling*, Webster's

Third New International Dictionary 932 (1971) ("1: the act or practice of betting : the act of

playing a game and consciously risking money or stakes on its outcome; 2: the act of risking

something on an uncertain event"); *Gamble*, Webster's Third New International Dictionary 932

(1971) ("1: a: to play a game of chance for money or other stakes; b: to wager money or stakes

on an uncertain outcome (as of a horse or an athletic game); 2: to stake something of value on an

uncertain event or contingency"); *Gamble*, Merriam-Webster's Collegiate Dictionary 478 (10th

ed. 1999) ("1: a: to play a game for money or property b: to stake something on an uncertain

outcome; 2: to stake something on a contingency; to take a chance"); *Gamble*, American

Heritage Dictionary of the English Language, http://ahdictionary.com/word/search.html?q

=gambling (last visited July 20, 2012) ("[t]o bet on an uncertain outcome, as of a contest," or

"[t]o play a game of chance for stakes").

Poker is sometimes treated as a synonym both for gambling generally and for the games

enumerated in the IGBA.  *See* Roget's International Thesaurus § 514.7 (3d ed. 1962) (listing, as

synonyms for "gamble," "(games of chance) . . . horse racing, keno, lotto, . . . roulette, . . . ;

poker, faro, etc. (card games)).

### 3. **Common Law**

Most states find that an "activity is . . . illegal gambling if a person risks something of value on an activity *predominately determined by chance* for the opportunity to win something of greater value than he or she risked."  Cabot & Hannum, *supra*, at 445 (emphasis added); *see also, e.g., Morrow v. State*, 511 P.2d 127, 129 (Alaska 1973).  *But see, e.g.,* Ariz. Rev. Stat. Ann. § 13-3301(4) ("'Gambling' or 'gamble' means one act of risking or giving something of value for the opportunity to obtain a benefit from a game or contest of chance or skill or a future contingent event but does not include bona fide business transactions which are valid under the law of contracts including contracts for the purchase or sale at a future date of securities or commodities, contracts of indemnity or guarantee and life, health or accident insurance."); 720 Ill. Comp. Stat. § 28-1 ("A person commits gambling when he . . . [p]lays a game of chance or skill for money or other thing of value . . . ."); *Charnes*, 773 P.2d at 551 ("While poker and perhaps some of the wagering games might involve some skill, these games certainly are contingent 'in part' upon chance, and when, as here, the games involve risking a thing of value for gain, they constitute a form of 'gambling' in its commonly understood sense."); *Barnett*, 488 P.2d at 257-59 (Wash. 1971) (holding that a game which involves an element of chance, even if skill is also involved, is sufficient to qualify it as gambling under state law).

### 4. **Legislative History**

#### a. **Purpose of the Statute**

Concerns about organized crime appear to have been the major driving force behind the Organized Crime Control Act of 1970 generally, as well as the IGBA specifically.  The goal of 18 U.S.C. § 1955 was "to give the Federal Government a new substantive weapon, a weapon

which will strike at organized crime's principal source of revenue: illegal gambling."  S. Rep.

No. 91-617, at 71 (1969); *see also* Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84

Stat. 922, 923 (codified in scattered sections of 18 U.S.C.) (stating that the purpose of the act was

"to seek the eradication of organized crime in the United States by strengthening the legal tools

in the evidence-gathering process, by establishing new penal prohibitions, and by providing

enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in

organized crime").  As President Nixon explained in his Message to Congress regarding the bill:

> While gambling may seem to most Americans to be the least reprehensible of all
> the activities of organized crime, it is gambling which provides the bulk of the
> revenues that eventually go into usurious loans, bribes of police and local
> officials, "campaign contributions" to politicians, the wholesale narcotics traffic,
> the infiltration of legitimate businesses, and to pay for the large stables of lawyers
> and accountants and assorted professional men who are in the hire of organized
> crime.

115 Cong. Rec. 10,043 (Apr. 23, 1969) (Organized Crime Message from the President of the

United States).

Prior to its enactment, the existing interstate-nexus requirement permitted large intrastate

gambling rings to escape federal prosecution.  *See House Judiciary Hr'gs* at 156-57 (statement

of Att'y Gen. John N. Mitchell) ("Federal jurisdiction under existing law . . . depends upon the

establishment of a specific link to interstate commerce on a case-by-case basis.  As a result,

many large-scale and lucrative illegal gambling operations, which we have reason to believe are

dominated by the Cosa Nostra, escape prosecution.").  Through the IGBA, Congress sought to

close this "loophole" by obviating the need for proof of an interstate nexus in each case.

*Measures Relating to Organized Crime: Hearings Before the Subcomm. on Crim. Laws &*

*Procedures of the S. Comm. on the Judiciary*, 91st Cong. 382-83 (1969) (hereinafter "*Senate*

*Judiciary Hr'gs*") (statement of Assistant Att'y Gen. Will Wilson); *see also* 116 Cong. Rec. 605

(Jan. 21, 1970) (statement of Sen. Allott). Federal enforcement was seen as particularly

necessary in light of what was perceived as a failure to prosecute gambling offenses due to the

widespread corruption of state officials by organized crime. S. Rep. No. 91-617, at 72 ("The

effect of . . . police corruption is stultifying on Federal-State cooperation in the campaign against

organized gambling. This inability of Federal agencies properly to enforce the statutes within

their jurisdiction is an important basis for the Congress to take action in this area."); *Senate*

*Judiciary Hr'gs* at 448 (Message from the President of the United States Relative to the Fight

Against Organized Crime) ("For most large scale illegal gambling enterprises to continue

operations over any extended period of time, the cooperation of corrupt police or local officials is

necessary."); 115 Cong. Rec. 10,736 (Apr. 29, 1969) (statement of Sen. Hruska) ("There are two

reasons for this continued growth of this gambling industry: first, the inability, and second, the

unwillingness of local authorities to take action against it."); 116 Cong. Rec. 591 (Jan. 21, 1970)

(statement of Sen. McClellan) ("[S]omething must be done to stop this flow of money to

organized crime from gambling operations, and we must stop the corruption of local officials and

law enforcement by organized crime."); 116 Cong. Rec. 604 (Jan. 21, 1970) (statement of Sen.

Allott) (The IGBA will permit "the Federal Government to intervene where local and State

governments have been rendered powerless because of the corruption of responsible officials.").

The IGBA was not designed to "define discrete acts of gambling as independent federal

offenses." *See Sanabria*, 437 U.S. at 70. The debates focused not on prohibiting particular kinds

of gambling, but on targeting particular kinds of criminals—i.e., reaching "those who are

engaged in an illicit gambling business of major proportions." S. Rep. 91-617, at 73; H.R. Rep.

91-1549, at 53 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4007, 4029 ("The intent of section 1511

and section 1955, below, is not to bring all illegal gambling activity within the control of the

federal government, but to deal only with illegal gambling activity of major proportions. It is anticipated that cases in which their standards can be met will ordinarily involve business-type gambling operations [of] considerably greater magnitude than simply meet the minimum definitions. The provisions of this title do not apply to gambling that is sporadic or of insignificant monetary proportions. It is intended to reach only those persons who prey systematically upon our citizens and whose syndicated operations are so continuous and so substantial as to be of national concern, and those corrupt state and local officials who make it possible for them to function."); *Senate Judiciary Hr'gs* at 449 (Message from the President of the United States Relative to the Fight Against Organized Crime) ("The purpose of this legislation is to bring under federal jurisdiction all large-scale illegal gambling operations which involve or affect interstate commerce."). *See also United States v. Cook,* 922 F.2d 1026, 1034 (2d Cir. 1991), *cert. denied* 500 U.S. 941 (1991) (noting that the federal interest underlying the IGBA is the eradication of large-scale gaming); *United States v. Farris,* 624 F.2d 890, 895 (9th Cir. 1980), *cert. denied,* 449 U.S. 1111 (1981), *superceded by statute,* Indian Gaming Regulatory Act of 1988, Pub. L. No. 100-497, 102 Stat. 2467, *as recognized in United States v. E.C. Investments, Inc.,* 77 F.3d 327 (9th Cir. 1996) ("The policy underlying § 1955 is that large-scale gambling is dangerous to federal interests wherever it occurs [including on an Indian reservation]."). Congress found that, where a state had outlawed a particular form of gambling, "organized crime had developed complex channels" to capitalize on the opportunity presented. *United States v. Sacco*, 491 F.2d 995, 1000 & n.6 (9th Cir. 1974) (citing President's Comm'n on Law Enforcement and Administration of Justice, Report: The Challenge of Crime in a Free Society 189 (1967); Task Force Report: Crime and its Impact - an Assessment 52-53 (1967)).

Congress did not propose to supplant the traditional role of states in regulating gambling. *Iannelli*, 420 U.S. at 788 (noting that Congress "recognize[ed] that gambling activities normally are matters of state concern" in limiting the scope of the federal statute to large-scale gambling operations); *House Judiciary Hr'gs* at 194 (statement of Assistant Att'y Gen. Will Wilson) ("[W]e are not trying to bring the whole gambling enforcement problem into the Federal jurisdiction, the Federal courts."). Rather, "[t]he purpose of the statute is simply to make the Federal Government a more effective member of the established State-Federal law enforcement partnership which has long been waging a common war on organized crime and illegal gambling." 116 Cong. Rec. 604 (Jan. 21, 1970) (statement of Sen. Allott); *see also, e.g., House Judiciary Hr'gs* at 170 (statement of Att'y Gen. John Mitchell) (stressing that the IGBA "does not proscribe gambling which is legitimate under state law, nor does it prohibit lotteries and bingo games conducted for charitable purposes. The federal proposal will not interfere with a State's right to regulate the conduct of citizens within its jurisdiction."); 116 Cong. Rec. 601 (Jan. 21, 1970) (statement of Sen. Hruska) (stating that the IGBA gives "the Attorney General broad latitude to assist local and state government in cracking down on illegal gambling, the wellspring of organized crime's reservoir") (quoting Organized Crime Message from the President of the United States, April 23, 1969); 116 Cong. Rec. 591 (Jan. 21, 1970) (statement of Sen. McClellan) ("[The IGBA] would give the Federal Government two new means to aid the States in combating large-scale gambling.").

b. **Definition of Gambling Generally**

In its original form, the IGBA did not include a separate definition of gambling. The statute's scope did not encompass all state gambling crimes, but only "betting, lottery, or numbers activity":

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both.

(b) As used in this section, the term 'illegal gambling business' means betting, lottery, or numbers activity which

(1) is a violation of the law of a State or political subdivision thereof;

(2) involves five or more persons who operate, work in, participate in, or derive revenue from said betting, lottery, or numbers activity; and

(3) has been or remains in operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

. . .

(d) This section does not apply to any bingo game, lottery, or similar game of chance conducted by an organization exempt from tax under section 501(c)(3) of the Internal Revenue Code of 1954, as amended, if no part of the gross receipts derived from such activity inures to the benefit of any private shareholder, member, or employee of such organization except as compensation for actual expenses incurred by him in the conduct of such activity.

Illegal Gambling Business Control Act of 1969, S. 2022, 91st Cong., 1st Sess. § 201; *see also* H.R. 10683, 91st Cong., 1st Sess. § 201 ("[T]he term 'illegal gambling business' means betting, lottery, or numbers activity . . . [and] involves five or more persons who operate, work in, participate in, or derive revenue from said betting, lottery, or numbers activity . . . ."); H.R. 10789, 91st Cong., 1st Sess. § 201(b) (same); H.R. 10944, 91st Cong, 1st Sess. § 201(b) (same); H.R. 11026, 91st Cong, 1st Sess. § 201(b) (same); H.R. 11345, 91st Cong, 1st Sess. § 201(b) (same); H.R. 13331, 91st Cong, 1st Sess. § 201(b) (same). No discussion of why a separate definition of gambling was included in the final version of the bill could be found. Nor could it be determined why that definition was changed to specify the nine enumerated games.

Descriptions of the statute's definition of an illegal gambling business varied. One of the bill's sponsors declared that "[a]n illegal gambling business is defined as, first, violating State law," possibly implying that the IGBA did not include a separate federal definition of gambling. 116 Cong. Rec. 601 (Jan. 21, 1970) (statement of Sen. Hruska); *see also Senate Judiciary Hr'gs* at 381 (statement of Assistant Att'y Gen. Will Wilson) ("[W]e have defined, for purposes of this

title, an illegal gambling business as one which is in violation of state or local law . . . ."); *House Judiciary Hr'gs* at 156 (statement of Att'y Gen. John Mitchell) ("[The IGBA] will make it a Federal offense to engage in a gambling operation which is illegal under State law . . . ."); 116 Cong. Rec. 35196 (Oct. 6, 1970) (statement of Sen. Poff) (same); 116 Cong. Rec. 35304 (Oct. 6, 1970) (statement of Sen. Railsback) ("[The IGBA] enlarges Federal jurisdiction over illegal gambling activities, which are defined as violating a law, involving 5 or more persons, operating for more than 30 days or having a gross income of $2,000 in one day."). Similarly, another senator stated that "[t]he approach of the bill is to define an 'illegal gambling business' in terms of the number of people involved and in terms of gross receipts and length of operation," rather than in relation to a federal gambling definition. 116 Cong. Rec. 602 (Jan. 21, 1970) (statement of Sen. Yarborough). Yet other members of Congress highlighted the fact that the statute targeted particular games. *See* 116 Cong. Rec. 603 (Jan. 21, 1970) (statement of Sen. Allott) ("The statute defines an 'illegal gambling business' as one including such forms of betting as bookmaking or numbers *and* which first, is a violation of state law . . . ." (emphasis added)); *House Judiciary Hr'gs* at 287 (statement of Rep. Halpern) ("[The IGBA and 18 U.S.C. § 1511] define 'illegal gambling business' so as to exclude bingo, lotteries, or games of chance conducted by religious or charitable organizations but would include any other betting, lottery or numbers activity in violation of State or local law . . . .").

In its report, the Senate Committee on the Judiciary indicated that the definition of gambling was limited to particular games. S. Rep. No. 91-617, at 73 ("It defines an 'illegal gambling business' as including 'pool selling, bookmaking, maintaining slot machines, numbers, and other gambling activity' which—(1) is a violation of State law . . . ."); *id.* ("Sections 1955(b)(1)-(3) define an 'illegal gambling business,' as above, as gambling or numbers activity .

. . . See proposed section 1511, above [discussed *infra* at Part V(B)(1)].").  While the Senate Committee went on to say that "State" and "gambling" are also defined comprehensively," it is unclear whether it meant that the terms were defined broadly, or merely defined thoroughly.

Congress never discussed the meaning of "gambling" in the IGBA more generally.  It did not address whether it encompassed games of some skill, or merely games predominated by chance.  The New York City Bar Association's Committee on Federal Legislation, however, assumed, in its report to Congress, that the statute "define[d] 'gambling' broadly to include virtually all games of chance."  *House Judiciary Hr'gs* at 323 n. 61 (Committee on Federal Legislation, The Association of the Bar of the City of New York, The Proposed Organized Crime Control Act of 1969 (S. 30) (1970)).

Nor did Congress debate whether a game would have to be house-banked to constitute gambling—although one senator expressed concern at the ability of organized crime to make large amounts of money from non-house-banked games.  *See Senate Judiciary Hr'gs* at 495 ("[In a numbers game, b]ets are placed on any three-digit numbers from one to 1,000.  The mathematical odds are 1,000 to one.  Yet seldom, however, is the payoff over 500 to one, and then, on cut numbers . . . it is even less.  The gambler thus seldom gambles.  In addition, he hedges his bet in a complicated layoff system. . . . The professional bookmaker . . . seldom gambles either.  He gives track odds or less without track expenses, pays no taxes, is invariably better capitalized or 'lays off' a certain percentage of his bets with other gamblers, takes credit bets to stimulate the play, and may even fix the event by corrupting private and professional sports.").

c. **Discussion of Particular Games**

In debating the IGBA, Congress stated that, at the time of the statute's enactment, the

Mafia played a significant role in organizing a wide array of gambling activities.

> Law enforcement officials agree almost unanimously that gambling is the greatest
> source of revenue for organized crime. It ranges from lotteries, such as 'numbers'
> . . . to off-track horse betting . . . . In large cities where organized criminal groups
> exist, very few of the gambling operators are independent of a large organization.
> . . .'Most large-city gambling is established or controlled by organized crime
> members through elaborate hierarchies. 'There is no accurate way of ascertaining
> organized crime's gross revenue from gambling in the United States. Estimates of
> the annual intake have varied from $7 to $50 billion. Legal betting at racetracks
> reaches a gross annual figure of almost $5 billion, and most enforcement officials
> believe that illegal wagering on horse races, lotteries, and sporting events totals at
> least $20 billion each year. Analysis of organized criminal betting operations
> indicates that the profit is as high as one-third of gross revenue—or $6 to $7
> billion each year. While the Commission cannot judge the accuracy of these
> figures, even the most conservative estimates place substantial capital in the hands
> of organized crime leaders.'

Report of the President's Commission on Law Enforcement and Administration of Justice, The

Challenge of Crime in a Free Society 188-189 (1967) (cited in *Iannelli*, 420 U.S. at 788); *see*

*also* 115 Cong. Rec. 10,041 (Apr. 23, 1969) (Organized Crime Message from the President of

the United States) ("Many decent Americans contribute regularly, voluntarily and unwittingly to

the coffers of organized crime—the suburban housewife and the city slum dweller who place a

twenty-five cent numbers bet; the bricklayer and college student who buy a football card; the

businessman and secretary who bet illegally on a horse."); 116 Cong. Rec. 590 (Jan. 21, 1970)

(Statement of Sen. McClellan) ("Organized crime, of course, does not limit its illegal gambling

operations to horse racing and sporting events.  It also includes gambling in the form of lotteries,

dice games, and illegal casinos.").  According to the Attorney General, "In an area which

organized crime has invaded, there are few independent gamblers.  Even if competitors have the

capital required to 'make it' on their own, the syndicate has methods of persuading them to join

up, or to go into business elsewhere." *House Judiciary Hr'gs* at 153 (statement of Att'y Gen. John N. Mitchell).

Debates focused primarily on Mafia-run numbers rackets—intrastate lotteries that offered lopsided odds and thus leached significant sums from poor communities. *See Senate Judiciary Hr'gs* at 495 (statement of Sen. McClellan) ("Most large slum areas, for example, have within them some form of a lottery known as numbers. . . . Assuming an honest payoff—often not the case—the ultimate effect of the racket is to drain the work income of slum residents away from food, clothing, shelter, health, and education."); *House Judiciary Hr'gs* at 87 (statement of Sen. McClellan) ("Cosa Nostra informant Joe Valachi . . . described well the impact of organized gambling on its direct victims when he said: 'It's poor people that play the numbers; and if you want the truth, most of them play because they are desperate for money and have no other way to get it.'").

In his message to Congress on Organized Crime, the President singled out "the numbers racket" as a particularly significant and pernicious form of gambling. *See Senate Judiciary Hr'gs* at 444 (1969) (Message from the President of the United States Relative to the Fight Against Organized Crime). Statements by other public officials echoed the sentiment. *Id.* at 158 (statement of Sen. Tydings) ("The greatest single source of revenue for organized crime is its gambling activities, which net an estimated seven (7) to fifty (50) billion dollars a year . . . . A great portion of this is gained through numbers rackets, draining from the poorest inhabitants of our ghettos and slums and their families precious dollars which should be spent for food, shelter and clothing."); *id.* at 425 (statement of William Hundley, former head of the Organized Crime and Racketeering Section at the Department of Justice) ("*[P]robably the only area where [the IGBA] would be helpful would be in getting at big numbers rackets*, because in my experience in

the Justice Department any gambling operation that was worth Federal concern had an interstate aspect, and that you could proceed under [the Paraphernalia Act] and the other bills. But some of the really big numbers operations, particularly in a place like New York, can be, by the nature of the operation, self-contained . . . and you could use this new [statute] against those. *I don't see that it would be really of much use otherwise in the gambling area.*" (emphasis added)); *id.* at 382-83 (statement of Assistant Attorney Gen. Will Wilson) (stating that "[v]ery few numbers operations have been prosecuted at a Federal level because seldom are state lines crossed" and that the IGBA is designed to close this "loophole").

Also of particular concern was bookmaking, which often relied on national crime syndicates. 116 Cong. Rec. 596 (Jan. 21, 1970) (statement of Sen. McClellan) ("Bookmaking is next up the ladder from the numbers, and the bookmaker, who usually employs several solicitors, is a man of substance."); *see also, e.g., The Federal Effort Against Organized Crime: Hearings Before Subcomm. of the House of Representatives Comm. on Gov't Operations*, 90th Cong. 49 (1967) ("Mr. EDWARDS: My friends tell me that [a local] pool hall operator [in a small town] might make a phone call to a larger city in the general area, where he lays off his bets, or whatever he does—perhaps a regional headquarters of sorts. Do you get into that phase of it? [Assistant Att'y Gen. Fred M.] VINSON: Yes, sir, we do. . . . He will get what is called the line, from some expert who will tell him that the proper odds are three points, or what have you, or that the proper odds on a horse are thus and so. And he pays for that service. And the people furnishing him those services we are very interested in, because we believe they are closely tied into organized crime."); *id.* at 64 (statement of William A. Kolar, Director of the Intelligence Division, Internal Revenue Service) ("It is generally agreed that the flow of money to bookmakers taking bets on horseracing and sporting events and wagers placed in lottery

operations total billions of dollars annually. From its huge gambling profits, organized crime is able to finance other illicit activities."); *Senate Judiciary Hearings* at 495 (statement of Sen. McClellan) ("The professional bookmaker . . . seldom gambles either. He gives track odds or less without track expenses, pays no taxes, is invariably better capitalized or 'lays off' a certain percentage of his bets with other gamblers, takes credit bets to stimulate play, and finally may even fix the event by corrupting private and professional sports."); 116 Cong. Rec. 604 (Jan. 21, 1970) (statement of Sen. Allott) (discussing arrests of bookmakers).

Scant reference was made to poker. This may be because, at the time, Mafia involvement in poker games was limited. *United States v. Roselli*, 432 F.2d 879, 886 n.8 (9th Cir. 1970) (noting that poker is not "traditionally associated with organized crime"). One senator expressed concern that the IGBA would reach poker:

> Mr. MIKVA: I would like to yield further but I have more examples of overreach that would even curl the hair of the gentleman from Virginia.
> I do not know how many of my colleagues engage in a friendly game of poker now and then, but under th[e IGBA's] definition [of gambling] if five or more of them engage in such a game of poker and it lasts past midnight—you do have that safeguard—thus continuing for a period of 2 days, then you have been running an organized gambling business and you can get 20 years, and the Federal Government can grab the pot besides.
> . . .
> We have a whole series of new crimes involving gambling and some of them, as I indicated, include even the poker game that goes beyond midnight. Under the bill, it can be an organized gambling game and one can get up to 20 years for having participated in that poker game.

116 Cong. Rec. 35204-05 (Oct. 6, 1970). Another senator attempted to soothe these concerns not on the basis that poker is not gambling, but because a friendly poker game would not meet the other requirements of the statute:

> Mr. POFF: I suggest that the gentleman is in error when he poses his hypothetical statement. I direct his attention to page 11, line 15 and 16 of the bill. There you will find that illegal gambling means a business and has been and remains in substantially continuous operation for a period in excess of 30 days or has a gross

revenue in excess of $2,000 in any single day. The poker game which the gentleman has described does not meet that criterion.

Mr. MIKVA: But that is not true because later on there is a presumption that it is an illegal gambling business. That language appears on page 114 and is as follows:

> If five or more persons conduct, finance, manage, supervise, direct, or own all or part of a gambling business and such business operates for 2 or more successive days, then, for the purpose of obtaining warrants for arrests, interceptions, and other searches and seizures, probable cause that the business received gross revenue in excess of $2,000 in any single day shall be deemed to have been established.

Mr. POFF: If they are in a gambling business.

Mr. MIKVA: I suppose it depends on whether you are gambling for profit or pleasure, but I happen to know a lot of people who do enjoy the profit as well as the pleasure, and I would hate to rely on the "nondefinition" or business to protect somebody from a zealous U.S. attorney.

*Id.* at 35205.

Another senator complained that Title VIII, in which both the IGBA and 18 U.S.C. § 1511 were contained, was overly broad.

> The breadth and vagueness of the 'scheme to obstruct provision' [in § 1511] are matched by the lack of precision in defining 'illegal gambling business.' Although the report states that the law is not intended to cover sporadic or small-scale gambling or to apply to 'players' in illegal games (pp. 73, 115), the statute itself easily encompasses such petty crimes and criminals and by its terms could apply to two men who park illegally on their way to an all-night poker game.

116 Cong. Rec. 854 (Jan. 22, 1970) (statement of Sen. Young).

Other senators did not mention poker or other card games in their discussions of gambling. *Senate Judiciary Hr'gs* at 495 (statement of Sen. McClellan) ("Professional gambling ranges from simple lotteries to bookmaking on horse or sports events.").

A comprehensive collection of the relevant history is on file in this court. *See* Doc. Entry 106, Aug. 17, 2012.

5. **Commission on the Review of the National Policy Towards Gambling**

In the section immediately following the IGBA, the Organized Crime Control Act of 1970 created a Commission on the Review of the National Policy Towards Gambling and charged it "to conduct a comprehensive legal and factual study of gambling in the United States and existing Federal, State, and local policy and practices with respect to legal prohibition and taxation of gambling activities and to formulate and propose such changes in those policies and practices as the Commission may deem appropriate." Pub. L. No. 91-452, § 805, 84 Stat. 922, 939. Although not part of the legislative history of the statute itself, the Commission's final report, completed in 1976, provides some insight into what a contemporary body, charged with its responsibilities by the same legislation, considered "gambling." *See generally Gambling in America: Final Report of the Commission on the Review of the National Policy Towards Gambling* (1976).

The report does not define gambling under either federal or state law, but acknowledges the diversity of practices covered by state laws prohibiting gambling. *See id.* at 35 ("Central to any discussion of illegal gambling is the fact that 'gambling' refers not to a single entity, but to a number of diverse activities that have differing implications for law enforcement. Illegal games vary in their structure from highly organized operations—for instance, the intricate network of locations and employees involved in a large numbers operation—to the spontaneity of street-corner cardplaying among friends. A numbers operator who pays protection to police and channels profits into narcotics poses a substantially different threat to the community than does a social club sponsoring bingo or card games for its members. Public social gambling and the lower levels of numbers operations are subject to enforcement without use of the sophisticated tools and procedures required to reach bookmakers, numbers bosses, and organized card or dice

games.").  Rather, the Report's focus is on legal and illegal numbers rackets, bookmaking, parimutuel betting, off-track betting, lotteries, bingo, and casino games.  *See generally id.*

Scant reference is made to poker in the report.  *Id.* at 39 ("[I]n a survey of Washington, D.C., police officers, respondents evaluated numbers-running and running a poker game as crimes for which it is difficult to make a case stick."); *id.* at 79 (stating that poker was among the most popular games at the turn of the century); *id.* at 89 tbl 5.7 (listing poker as one of the games played at legal casinos in Nevada); *id.* at 176 ("Like pool and poker, backgammon has its share of skillful hustlers who win great sums of money from their unsuspecting opponents.").

Poker was not explicitly included in the list of illegal gambling activities on which the commission collected survey data, although it was likely included in the survey term "casino games."  *See id.* at 57-77 (discussing data collected in a survey of public participation in and attitude towards legal gambling (horse track betting, off-track betting, slot machines, keno, legal casinos, bingo, lotteries, and sports betting parlors) and illegal gambling (sports books, horse books, numbers, sports cards, and casino games).  Although poker is mentioned in the section on illegal casinos, the report highlighted black jack and roulette as the primary games played in such establishments.  *Id.* at 176.

### 6. Subsequent Mafia Involvement in Poker Games

The Mafia appears to have become involved in running poker games as early as 1974—after the passage of the IGBA.  *See Las Vegas Nites' Face Study on Mob Influence*, N.Y. Times, Aug. 14, 1974 (discussing an investigation of organized crime infiltration into "Las Vegas Nite" poker and blackjack games at Brooklyn synagogues and churches).  It apparently continues to operate such games.  *See, e.g.,* Bruce Golding, *Gambler hit with 21 mos.*, N.Y. Post, Dec. 20, 2011, at 9 ("Reputed Mafia associate Michael 'Mush' Russo was slapped with 21 months in the

slammer yesterday for running poker games and bookmaking operations for the Gambino family."); Howard Pankratz, *16-year term for gambling figure Jeffrey Castardi's Gin Rummy Club was used as a front*, Denver Post, Dec. 15, 2009, at B05 (discussing the conviction of a defendant with alleged Gambino crime family connections for running an illegal gambling and loan-sharking operation that included high-stakes poker, as well as sports betting); Lee Hammell, *Card Dealer Testifies Ciampi Wanted Rivals Dead,* Worcester (MA) Telegram & Gazette, Oct. 29, 1998, at A17 (describing the testimony of an informant who dealt poker at several Mafia-run gambling clubs); David Webber, *Reputed mobster dealt 7 1/2-year prison sentence*, Boston Herald, Sept. 19, 1995, at 20 ("Reputed Mafia soldier Ralph Lamattina began a 7 1/2-year prison sentence yesterday for running a high stakes poker game . . . ."); Richard J. Connolly, *Anguilo's Son Found Guilty of Gaming Innocent Finding on Racketeering,* Boston Globe, Aug. 14, 1986, at 25 ("Mafia soldier John C. Cincotti, 46, of Wayland, formerly of Boston's North End, was convicted of racketeering and conducting a high-stakes poker game for his leaders. He could be sentenced to 40 years in prison and fines of $70,000."); *see generally United States v. Angiulo*, 847 F.2d 956 (1st Cir. 1988) (discussing an alleged high-stakes poker game run by the Mafia which led to convictions under, *inter alia,* 18 U.S.C. § 1955); *United States v. Dono*, No. 07-CR-725, 2009 WL 2405886 (E.D.N.Y. Aug. 3, 2009) (Weinstein, J.) (providing a statement of reasons for sentence imposed on a Colombo crime family associate for a violation § 1955 by operating an illegal gambling business of poker games in violation of New York Penal Laws § 225.05 and 20, among other offenses, and noting that defendant's "illegal gambling operations . . . sustained the mob enterprise"); *United States v. Uvino*, No. 07–CR–725, 2009 WL 2366562 (E.D.N.Y. July 30, 2009) (Weinstein, J.) (same, noting that defendant's "gambling activities sustained the mob's extensive criminal power" and that "gambling profits . . . constitute the

lifeblood of a dangerous and destructive criminal enterprise"); *United States v. Digiacomo*, 746 F. Supp. 1176 (D. Mass. 1990) (discussing charges against several alleged Mafiosos for, *inter alia*, running illegal poker games); *see also* Gov't Mem. of L. in Opp. to Def.'s Rule 29 Mot. Ex. A-G, Doc. Entry 96, July 27, 2012 (describing recent prosecutions of alleged organized crime members for, *inter alia*, running illegal poker games).

### B.  **Other Gambling Statutes**

Because "context gives meaning," *Santos*, 553 U.S. at 512, consideration should be given to how gambling is defined in other portions of the Organized Crime Control Act of 1970, of which the IGBA was a part.  Congressional definitions of gambling in prior and subsequent acts, while not determinative, may also be persuasive in discerning the definition in the statute before the court.  *See McBoyle,* 283 U.S. at 26-27 (examining how "vehicle" is defined in later acts in interpreting the term as used in the National Motor Vehicle Theft Act); *Thielebeule v. M/S Nordsee Pilot*, 452 F.2d 1230, 1232 (2d Cir. 1971) (stating that two statutes that "deal with the matters relating to the same subject matter . . . should therefore be construed *in pari materia*").  While subsequent statutes can provide further background on Congressional conceptions of gambling, they can neither broaden nor narrow the definition of gambling under the IGBA.

### 1. **Contemporary with the IGBA**

In addition to criminalizing the substantive offense of operating an illegal gambling business, the Organized Crime Control Act of 1970 separately outlawed a conspiracy to obstruct the enforcement of state criminal laws with intent to facilitate an illegal gambling business.  18 U.S.C. § 1511.  "Since §§ 1511 and 1955 were enacted together as Parts B and C (§§ 802-803) of Title VIII of the Organized Crime Control Act of 1970, P.L. 91-452, 84 Stat. 936-37 (1970),

they should be construed *in pari materia*." *United States v. Becker*, 461 F.2d 230, 232 (2d Cir. 1972).

The structure of § 1511, as well as its definition of an illegal gambling business, is similar to that of the IGBA. It provides that:

**(a)** It shall be unlawful for two or more persons to conspire to obstruct the enforcement of the criminal laws of a State or political subdivision thereof, with the intent to facilitate an illegal gambling business if--

> **(1)** one or more of such persons does any act to effect the object of such a conspiracy;

> **(2)** one or more of such persons is an official or employee, elected, appointed, or otherwise, of such State or political subdivision; and

> **(3)** one or more of such persons conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business.

**(b)** As used in this section--

> **(1)** "illegal gambling business" means a gambling business which--

>> **(i)** *is a violation of the law of a State* or political subdivision in which it is conducted;

>> **(ii)** involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

>> **(iii)** has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

> **(2)** *"gambling" includes but is not limited to* pool-selling, bookmaking, maintaining slot machines, roulette wheels, or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

> **(3)** "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

**(c)** This section shall not apply to any bingo game, lottery*, or similar game of chance* conducted by an organization exempt from tax under paragraph (3) of subsection (c) of section 501 of the Internal Revenue Code of 1986, as amended,

if no part of the gross receipts derived from such activity inures to the benefit of any private shareholder, member, or employee of such organization, except as compensation for actual expenses incurred by him in the conduct of such activity.

18 U.S.C. § 1511 (emphasis added).

In its report, the House of Representatives described this section as making it "unlawful to engage in a conspiracy to obstruct the enforcement of state law to facilitate an 'illegal gambling business,' defined as (1) violating state law; (2) involving five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such a business, and (3) operating in excess of 30 days or having a gross revenue of $2,000 in any single day." H.R. Rep. No. 91-1549, at 4010. It did not state that a violation of a federal definition of gambling was an element of the offense.

The Senate Committee on the Judiciary, by contrast, intimated that gambling was limited to the enumerated games. S. Rep. No. 91-617, at 155 ("Section 1511(b)(1)-(3) define an illegal gambling business to include poolselling, bookmaking, maintaining slot machines, roulette wheels, or dice tables and conducting lotteries, policy, bolita, or numbers activity which (i) is in violation of the law of a State or political subdivision thereof, (ii) involves five or more persons who participate in betting activity; (iii) has been or remains in operation for a period in excess of 30 days or has a gross revenue of $2,000 in any single day. See proposed section 1955(b) below. 'State' and 'gambling' are defined comprehensively.").

No case was found arguing that the definition of gambling provided by § 1511(b)(2) limited the kinds of state gambling crimes prosecutable under the statute. Courts have upheld convictions under § 1511 for running an illegal poker game following unrelated challenges. *See generally United States v. Zemek*, 634 F.2d 1159 (9th Cir.

1980) (holding that there was sufficient evidence to support defendants' convictions under § 1511 and § 1955 for running a gambling business involving black jack and pot limit poker); *but cf. generally United States v. Nettles*, 570 F.2d 547 (5th Cir. 1978) (vacating defendant's conviction under § 1511 and § 1955 for running a gambling business involving poker games because his trial was improperly joined with that of his co-conspirators).

## 2. **Pre-IGBA**

### a.  **Transporting Gambling Materials**

Several federal statutes—none of which is contemporaneous with the IGBA— criminalizes the transportation of various gambling-related materials.  None of these statutes makes explicit mention of poker or other card games.

The earliest of these laws, dating back to the 1890s, prohibits the foreign importation and interstate transportation of lottery tickets, 18 U.S.C. § 1302, or the use of the mails for distribution or sale of any lottery or similar scheme, 18 U.S.C. § 1301.  *See Federal Regulation of Gambling*, 60 Yale L.J. 1396, 1401-02 (1951).  Lotteries were defined as contests in which the outcome was dependent "in whole or in part upon lot or chance."  18 U.S.C. §§ 1301-02.

As other forms of gambling rose to prominence, Congress moved to restrict those games. In 1951, Congress forbade the transportation of slot machines and other gambling devices to states where such devices are illegal, and to regulate the manufacture and repair of those devices. An Act to prohibit transportation of gambling devices in interstate and foreign commerce, Pub. L. No. 81-906, 64 Stat. 1134 § 2 (1951) (codified as amended at 15 U.S.C. §§ 1171-78).  The statute's definition of "gambling device" focuses on devices permitting players to win prizes by

operation of chance.  15 U.S.C. § 1171 ("The term "gambling device" means--(1) any so-called

"slot machine" or any other machine or mechanical device an essential part of which is a drum or

reel with insignia thereon, and (A) which when operated may deliver, *as the result of the*

*application of an element of chance*, any money or property, or (B) by the operation of which a

person may become entitled to receive, *as the result of the application of an element of chance,*

*any money or property*; or (2) any other machine or mechanical device (including, but not

limited to, roulette wheels and similar devices) designed and manufactured primarily for use in

connection with gambling, and (A) which when operated may deliver, *as the result of the*

*application of an element of chanc*e, any money or property, or (B) by the operation of which a

person may become entitled to receive, *as the result of the application of an element of chance*,

any money or property; or (3) any subassembly or essential part intended to be used in

connection with any such machine or mechanical device, but which is not attached to any such

machine or mechanical device as a constituent part." (emphasis added)).  It specifically excludes

particular types of machines, including machines which do not depend on an element of chance.

15 U.S.C. § 1178(2) ("None of the provisions of this chapter shall be construed to apply . . . to

any machine or mechanical device, such as a coin-operated bowling alley, shuffleboard, marble

machine (a so-called pinball machine), or mechanical gun, which is not designed and

manufactured primarily for use in connection with gambling, and (A) which when operated does

not deliver, *as a result of the application of an element of chance*, any money or property, or (B)

by the operation of which a person may not become entitled to receive, *as the result of the*

*application of an element of chance*, any money or property, or . . . to any so-called claw, crane,

or digger machine and similar devices which are not operated by coin, are actuated by a crank,

and are designed and manufactured primarily for use at carnivals or county or State fairs."

(emphasis added)).  This definition of "gambling devices" might include video or Joker Poker machines, *see United States v. One Hundred Thirty-Seven (137) Draw Poker-Type Machines and Six (6) Slot Machines,* 765 F.2d 147 (6th Cir. 1985) (table), *available at* 1985 WL 13304, at *2, but apparently not paraphernalia used in live poker games.

The Paraphernalia Act, 18 U.S.C. § 1953, passed in 1961, Pub. L. No. 87-218, § 1, 75 Stat. 492, more broadly forbids carrying or sending "in interstate or foreign commerce any record, paraphernalia, ticket, certificate, bills, slip, token, paper, writing, or other device used, or to be used, or adapted, devised, or designed for use in (a) bookmaking; or (b) wagering pools with respect to a sporting event; or (c) in a numbers, policy, bolita, or similar game," § 1953(a), unless such games were authorized by state law, *see* § 1953(b) ("This section shall not apply to (1) parimutuel betting equipment, parimutuel tickets where legally acquired, or parimutuel materials used or designed for use at racetracks or other sporting events in connection with which betting is legal under applicable State law, or (2) the transportation of betting materials to be used in the placing of bets or wagers on a sporting event into a State in which such betting is legal under the statutes of that State, or (3) the carriage or transportation in interstate or foreign commerce of any newspaper or similar publication, or (4) equipment, tickets, or materials used or designed for use within a State in a lottery conducted by that State acting under authority of State law, or (5) the transportation in foreign commerce to a destination in a foreign country of equipment, tickets, or materials designed to be used within that foreign country in a lottery which is authorized by the laws of that foreign country.").  As amended in 1979, § 1953, like § 1301, defines lottery as involving an element of chance.  Pub. L. No. 96-90, § 2(e), 93 Stat. 698 (1979) (codified at 18 U.S.C. § 1953(e)) ("For the purposes of this section 'lottery' means the pooling of proceeds derived from the sale of tickets or chances and *allotting those proceeds or parts thereof*

83

*by chance to one or more chance takers or ticket purchasers*. 'Lottery' does not include the placing or accepting of bets or wagers on sporting events or contests." (emphasis added)).

The Paraphernalia Act has been interpreted as covering video poker machines. *See United States v. Wall*, 92 F.3d 1444, 1458 & n.11 (6th Cir. 1996). No case was found in which the Act was used to prosecute transportation of forms of paraphernalia used in live poker games, such as cards or chips.

### b. Gambling Ships

In 1949, Congress forbade the operation of gambling ships flying under the American flag or otherwise within United States jurisdiction. The Gambling Ship Act, Pub. L. No. 81-72, ch. 139, § 23, 63 Stat. 92, 93 (1949) (codified as amended at 18 U.S.C. §§ 1081-83). Like other early gambling laws, for purposes of this section, Congress implicitly defined gambling, in part, as playing a lottery or other game of chance. 18 U.S.C. § 1081 ("'[G]ambling establishment' means any common gaming or gambling establishment operated for the purpose of gaming or gambling, including accepting, recording, or registering bets, *or carrying on a policy game or any other lottery, or playing any game of chance, for money or other thing of value*." (emphasis added)). It does not proscribe poker.

### c. Wire Act

The Wire Act, Pub. L. No. 87-216, § 2, 75 Stat. 491 (1961) (codified as amended at 18 U.S.C. § 1084) forbids use of a "wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in

the placing of bets or wagers." 18 U.S.C. § 1084(a). The Act applies only to wagering on sporting events. *See generally* U.S. Dep't of Justice, Office of the Legal Counsel, Whether Proposals By Illinois and New York to Use the Internet and Out-of-State Transaction Processors to Sell Lottery Tickets to In-State Adults Violate the Wire Act, 35 Op. O.L.C. 1 (2011), *available at* http://www.justice.gov/olc/2011/state-lotteries-opinion.pdf.

d. **Travel Act**

Passed in 1961, the Travel Act, Pub. L. No. 87-228, 75 Stat. 498, punishes individuals who "travel[] in interstate or foreign commerce or use[] the mail or any facility in interstate or foreign commerce, with intent to--(1) distribute the proceeds of any unlawful activity; or (2) commit any crime of violence to further any unlawful activity; or (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform" any of those acts. 18 U.S.C. § 1952(a). The statute specifies that "unlawful activity" includes "*any business enterprise involving gambling* . . . in violation of the laws of the State in which they are committed or of the United States." 18 U.S.C. § 1952(b)(1) (emphasis added). It does not mention poker or otherwise enumerate any specific games that constitute gambling.

While individuals have been prosecuted under the Travel Act for poker-related activities, the alleged unlawful activity has been a violation of state, rather than federal, gambling laws. *See generally, e.g., United States v. Izzi*, 385 F.2d 412 (7th Cir. 1967); *South v. United States,* 368 F.2d 202 (5th Cir. 1966).

### 3. Post-IGBA

#### a. **Indian Gambling Regulatory Act**

Unlike many other federal statutes dealing with gambling, which criminalize particular games or gaming-related activity, the Indian Gaming Regulatory Act (IGRA), Pub. L. No. 100-497, 102 Stat. 2467 (1988) (codified at 25 U.S.C. § 2701 *et seq.*), was designed "to provide a statutory basis for the operation of gaming by Indian tribes" while also permitting "the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences." 25 U.S.C. § 2702(1)(2). Towards that end, it classifies games into three categories subject to varying levels of regulation.

Class I games are "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations." 25 U.S.C. § 2703(6). These games are subject to the exclusive jurisdiction of the tribes. 25 U.S.C. § 2710(a)(1).

House-banked card games are Class III games. 25 U.S.C. § 2703(7)(B)(i) (defining Class II games as excluding "any banking card games, including baccarat, chemin de fer, or blackjack (21)"); *id.* § 2703(8) ("The term 'class III gaming' means all forms of gaming that are not class I gaming or class II gaming."). These games are subject to the strictest regulation. Such games are prohibited unless (1) authorized by a tribal ordinance or resolution; (2) located in a state that permits the particular gaming for any purpose by any person, organization or entity; and (3) conducted in accordance with a compact negotiated between the Indian tribe and the state. 25 U.S.C. § 2710(d)(1).

Class II games include other card games, such as poker, that are either authorized or not specifically prohibited by state law, as well as games such as bingo, lotto, pull-tabs, tip jars, and punch boards. *See* 25 U.S.C. § 2703(7)(A)(ii)("The term 'class II gaming' means-- . . . card games that . . . are explicitly authorized by the laws of the State, or . . . are not explicitly prohibited by the laws of the State and are played at any location in the State[,] but only if such card games are played in conformity with those laws and regulations (if any) of the State regarding hours or periods of operation of such card games or limitations on wagers or pot sizes in such card games."). Class II gaming is only permitted (1) if carried on in a state that allows such gaming for any purpose by any person, organization, or entity; (2) if not prohibited by federal law; and (3) if a tribal ordinance or resolution has been adopted permitting such gaming. 25 U.S.C. § 2710(b)(1)(A)-(B).

Federal law criminalizes gambling in Indian country that violates state law and is not in compliance with the Indian Gambling Regulatory Act. 18 U.S.C. § 1166(b) ("Whoever in Indian country is guilty of any act or omission involving gambling, whether or not conducted or sanctioned by an Indian tribe, which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State in which the act or omission occurred, under the laws governing the licensing, regulation, or prohibition of gambling in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment."). Such gambling activity is punishable if it violates state licensing, regulatory, or prohibitory law even though it may not violate federal law. 18 U.S.C. § 1166(a)-(b). It incorporates the various gaming classifications into its definition of gambling:

**(c)** For the purpose of this section, the term "gambling" does not include--

> **(1)** class I gaming or class II gaming regulated by the Indian Gaming Regulatory Act, or
>
> **(2)** class III gaming conducted under a Tribal-State compact approved by the Secretary of the Interior under section 11(d)(8) of the Indian Gaming Regulatory Act that is in effect.

18 U.S.C. § 1166.  To the extent that it is authorized by state law, poker would not be prosecutable as "gambling" under this statute.  If forbidden by state law, as it is in New York, or if conducted in violation of state law, and in the absence of a tribal-state compact, it would constitute gambling and would be punishable under this statute.  *See Dalton v.*, 780 N.Y.S.2d at 64 n.5 (describing "stud" poker as "a class III game under IGRA").

In *United States v. Cook*, the Court of Appeals for the Second Circuit noted the similarities between the IGBA and 18 U.S.C. § 1166.

> [G]ambling activity that violates state licensing, regulatory, or prohibitory law *is punishable even though it may not violate federal law*. 18 U.S.C. § 1166(a). Similarly, 18 U.S.C. § 1955 prohibits gambling businesses that violate the law of the state in which they are conducted. *Id.* § 1955(b)(1)(i). . . . [B]oth provisions punish gambling operations that violate state law.

922 F.2d at 1034 (emphasis added).  The court explained that "the scope of section 1955 exceeds that of section 1166" because it was designed to target illegal gambling businesses, rather than gambling activity itself.  *Id.*

Despite the superficial similarities in the statutes, neither the *Cook* case nor 18 U.S.C. § 1166 resolve the questions at issue in this case.  In 18 U.S.C. § 1166, the statute is explicit that a violation of state law is sufficient to violate that federal statute.  Under the IGBA, while it is clear that a violation of state law is necessary, it is insufficient.

b.  **National Gambling Impact Study Commission Act**

In 1996, Congress passed the National Gambling Impact Study Commission Act

(NGISC).  Pub. L. No. 104-169, 110 Stat. 1482 (1996) (codified at 18 U.S.C. § 1955 notes).

Although the act did not amend the text of the IGBA itself, Congress directed that the NGISC be

incorporated into the notes following that statute in the United States Code.  *Id.*

The purpose of NGISC was different than that of the IGBA.  The NGISC was designed to

uncover "the social and economic impacts of gambling" in light of the fact that the "legalization

of gambling ha[d] increased substantially over the [prior] 20 years," and particularly the "growth

of various forms of gambling, including electronic gambling and gambling over the Internet." *Id.*

§ 2(2)-(4).  At the same time, illegal gambling businesses remained a concern.  As the United

States House of Representatives pointed out in its report on the bill:

> Illegal gambling operations also exist on a remarkable scale. At its hearing, the
> Committee listened to testimony from a former mob bookmaker from Chicago
> now turned government informant. This informant testified about the vast size of
> illegal gambling operations. He also testified that illegal gambling operations
> welcome new forms of legalized gambling because they teach more and more
> people to gamble thereby increasing the number of illegal gamblers. Given that
> testimony, illegal gambling must be treated, along with legalized gambling, as
> part of one large interrelated issue.

H.R. Rep. No. 440, *reprinted in* 1996 U.S.C.C.A.N. 1192, 1194; *see also* 142 Cong. Rec.

H8035-02, H8037-38 (daily ed. July 22, 1996) (statement of Sen. Hyde) ("The traditional

linkage between gambling and crime also concerns me. To give just one example, a [U.S.

Government Accountability Office] report issued in January concluded that 'the proliferation of

casinos, together with the rapid growth of the amounts wagered, may make these operations

highly vulnerable to money laundering.' As gambling continues to spread, these negative effects

and others spread with it."); *cf. id.* H8040 (statement of Sen. Wolf) ("One of the most startling

and unfortunate consequences of gambling has been the amount of public corruption attendant to

it. Industry spokesmen claim that the days of Bugsy Segal and Joseph Bonano are behind it. The industry, they claim, is composed of law abiding companies which report to stockholders instead of organized criminal enterprises. The industry, more than any other, however, has been connected to unprecedented levels of political corruption in recent years. The confluence of money, politics, and power has wreaked havoc in many States and local jurisdictions."). Congress concluded that "a Federal commission should be established to conduct a comprehensive study of the social and economic impacts of gambling in the United States." NGISC § 2(5).

Rather than incorporating the definition of gambling already provided by the IGBA, the NGISC laid out its own, stating:

> The term "gambling" means any legalized form of wagering or betting conducted in a casino, on a riverboat, on an Indian reservation, or at any other location under the jurisdiction of the United States. Such term includes any casino game, parimutuel betting, sports-related betting, lottery, pull-tab game, slot machine, any type of video gaming, computerized wagering or betting activities (including any such activity conducted over the Internet), and philanthropic or charitable gaming activities.

*Id.* § 8(1). Despite its incorporation into the notes of § 1955, this subsequent, expanded definition of gambling does not enlarge a meaning in the earlier IGBA. *Williams v. United States*, 327 U.S. 711, 718 (1946) ("Where offenses have been specifically defined by Congress and the public has been guided by such definitions for many years, it is not natural for Congress by general legislation to amend such definitions or the punishments prescribed for such offenses, without making clear its intent to do so.").

In its final report, the Commission acknowledged that "[g]ambling is an ephemeral subject, the study of it is frustrated by the apparently solid repeatedly slipping away." Kay C. James et al., National Gambling Impact Study Commission Final Report 1-2 (1999). For the

purpose of its "gambling behavior" questionnaires, it defined gambling as "placing a bet on the outcome of a race or game of skill or chance, or playing a game—including for charity—in which one might win or lose money." *Id.* at 7. The questionnaire sought information on a variety of gaming types and locations. *Id.* at 9-10 (describing the survey as covering casino gaming, pari-mutuel wagering, lottery, bingo, charitable gaming, cardrooms, private games, small businesses, unlicensed games, and internet gambling). Several of these survey modules—casinos, cardrooms, private games, and internet gambling—arguably covered poker.

Conspicuously, the Commission neglected poker in its research and report. The game is mentioned only in passing. *Id.* at 6 ("California has a pari-mutuel racetrack facility that has a cardroom where patrons may wager on poker."); *id.* at 22 ("[In Natale, a police sergeant mentioned,] "we just have neighborhood poker games, which are technically illegal by the letter of the law," after acknowledging that he has not seen an increase in illegal gambling in the community.").

### c. Unlawful Internet Gambling Enforcement Act of 2006

Most recently, Congress passed the Unlawful Internet Gambling Enforcement Act of 2006, Pub. L. No. 109-347, §§ 801-03, 120 Stat 1884 (codified at 31 U.S.C. §§ 5361–5367). The statute prohibits gambling businesses from knowingly accepting payments in connection with the participation of another person in a bet or wager that involves the use of the Internet and that is unlawful under any federal or state law. 31 U.S.C. § 5363. It states that "unlawful Internet gambling" is "plac[ing], receiv[ing], or otherwise knowingly transmit[ting] a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." 31 U.S.C. § 5362(10)(A). It defines

"bet or wager," in relevant part, as "the staking or risking by any person of something of value upon the outcome of a contest of others, a sporting event, *or a game subject to chance*, upon an agreement or understanding that the person or another person will receive something of value in the event of a certain outcome."  31 U.S.C. § 5362(1)(A) (emphasis added).

## VI.  Proof Needed That Business Engaged in "Gambling" Under the IGBA

### A.  Limited Case Law Interpreting 18 U.S.C. § 1955(b)(2)

Only one court appears to have directly addressed the question of whether the government must prove that the alleged business activity constituted gambling under the IGBA in addition to violating state law.  In *United States v. Atiyeh*, the defendant was accused of running an unlicensed sports-betting operation.  402 F.3d 354, 358-59 (3d Cir. 2005).  A jury convicted him of illegal gambling under 18 U.S.C. § 1955.  In its special verdict, the jury found that the defendant's conduct did not constitute bookmaking; rather, "the business was an illegal gambling business based upon becoming a custodian of funds that were wagered or to be wagered."  Third-Step Cross-Appeal Br. for George Atiyeh at 31, United States v. Atiyeh, 402 F.3d 354 (3d Cir. 2005), Nos. 03-1746, 03-1472, 03-1757, 2004 WL 3759626, at *31.

Following the verdict, the trial judge granted the defendant's post-verdict motion for a judgment of acquittal conviction on the ground that the defendant's conduct had not violated Pennsylvania state law.  *Id.* at 369.  The Court of Appeals for the Third Circuit reversed, holding that the district court's interpretation of Pennsylvania law was erroneous.  402 F.3d at 369-70.

On appeal, the defendant argued, in the alternative, that a conviction under 18 U.S.C. § 1955 could not lie because the conduct for which he was convicted—being a custodian of funds that were wagered or to be wagered—while illegal under Pennsylvania law, was not "gambling"

as defined in 18 U.S.C. § 1955(b)(2).  *Id.* at 372; *see also* Third-Step Cross-Appeal Br. for

George Atiyeh, United States v. Atiyeh, 402 F.3d 354 (3d Cir. 2005), Nos. 03-1746, 03-1472,

03-1757, 2004 WL 3759626, at *31 ("All ten kinds of conduct listed as included within the

definition of 'gambling' are ways of taking bets or conducting games of chance. None are

business activities ancillary to the actual taking of bets or paying of winning bettors. It is not

enough, to constitute a violation of § 1955 that *Mr. Atiyeh* may have become a custodian of

funds that were wagered." (emphasis in original)).  In its reply brief, the government stated,

without further explanation or analysis, that "Section 1955(b) defines 'illegal gambling business'

as '(i) a violation of the law of a State or political subdivision in which it is conducted.'"  Fourth-

Step Br. for the United States of America, United States v. Atiyeh, 402 F.3d 354 (3d Cir. 2005),

Nos. 03-1746, 03-1472, 03-1757, 2004 WL 3759627, at *14.  Neither party briefed the

legislative history of the statute.

     The Court of Appeals for the Third Circuit found that a violation of state law was itself

sufficient to trigger IGBA liability, explaining:

> The relevant definition for our purposes is that of an "illegal gambling business,"
> provided for in 18 U.S.C. § 1955(b)(1), not the definition of "gambling" provided
> for in § 1955(b)(2). The jury found that [the defendant] violated 18 Pa. Cons. Stat.
> § 5514(4), and therefore operated an "illegal gambling business" as defined by 18
> U.S.C. § 1955(b)(1).  We have held that the mere custodianship of gambling-
> related funds is sufficient to constitute a violation of 18 U.S.C. § 1955, because
> such custodianship is considered to be "gambling" under state law even though it
> may not appear to fit within "gambling" as defined in § 1955(b)(2).

402 F.3d at 372.

     As developed in the instant decision's analysis, and as applied to poker, the *Atiyeh*

decision is not persuasive on the issue of whether a violation of a state anti-gambling law is

sufficient to permit a federal criminal conviction.  That court did not have the benefit of the

extensive briefing on the text and history of the IGBA available to this court.  Rather than

grappling with the text of the statute itself, the Court of Appeals for the Third Circuit relied on

prior decisions which did not consider that issue of interpretation. It failed to resolve the

ambiguities in the text and history of the IGBA.

The overwhelming majority of cases have assumed, without analysis, that the

government need only prove that the business involved gambling as defined by state law, not that

the game operated constituted "gambling" as defined by the IGBA. *See, e.g., Gotti*, 459 F.3d at

340 ("This statute provides that '[w]hoever conducts, finances, manages, supervises, directs, or

owns all or part of an *illegal gambling business* shall be fined under this title or imprisoned not

more than five years, or both.' 18 U.S.C. § 1955(a) (emphasis added). An 'illegal gambling

business,' in turn, is defined as one which '(i) is a violation of the law of a State . . . in which it

is conducted; (ii) involves five or more persons who conduct, finance, manage, supervise, direct,

or own all or part of such business; and (iii) has been or remains in substantially continuous

operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single

day." 18 U.S.C. § 1955(b)(1).'"); *United States v. Truesdale*, 152 F.3d 443, 446 (5th Cir. 1998)

("Under section 1955, an illegal gambling business is defined as a gambling business that: (1)

violates state or local law, (2) involves 5 or more people, and (3) is in continuous operation for

more than 30 days or has gross revenue of $2,000 in a single day."); *United States v. Cyprian,* 23

F.3d 1189, 1199 n.14 (7th Cir. 1994) ("To establish a violation of § 1955, the government must

show that the defendant conducted, financed, managed, supervised, directed, or owned a

gambling business that: (1) violated state law; [*and*] (2) involved five or more persons; *and* (3)

was either in substantial continuous operation for more than 30 days or had gross revenue of

$2,000 or more in a single day." (emphasis added)); *United States v. Sacco*, 491 F.2d 995, 998

(9th Cir. 1974) (en banc) ("The statute requires that three elements be established to constitute an

offense: there must be a gambling operation which (1) is a violation of the law of a State or political subdivision in which it is conducted; (2) involves five or more persons who conduct, finance, manage, supervise, direct or own all or part of such business; and (3) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.").

The statute has been used to prosecute games that are not enumerated in Section 1955(b)(2), *see, e.g., United States v. Useni*, 516 F.3d 634 (7th Cir. 2008) (bingo); *United States v. Reitano*, 862 F.2d 982 (2d Cir. 1988) (rough-and-tumble blackjack); *United States v. Tucker*, 638 F.2d 1292 (5th Cir. 1981) (blackjack); *United States v. Shursen*, 649 F.2d 1250 (8th Cir. 1981) (blackjack), including poker, *see* Part VII(A), *infra*.

A minority of opinions have implied that the government must prove that the business ran games that also constituted "gambling" as defined by the IGBA. *See United States v. Hunter*, 478 F.2d 1019, 1021 n.2 (7th Cir. 1973) ("As defined in the statute, '"gambling"' includes but is not limited to pool-selling, book-making, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.' In this case appellants concede that their activities constituted 'gambling' as so defined, *and* that they were conducted in violation of the law of Indiana." (emphasis added)); *United States v. Kaczowski*, 114 F. Supp. 2d 143, 152 (W.D.N.Y. 2000) ("Section 1955 defines an 'illegal gambling business as a gambling business which . . . is a violation of the law of State of political subdivision in which it is conducted . . . .' 18 U.S.C. § 1955(b)(1). Further, 'gambling' is defined thereunder to include bookmaking. 18 U.S.C. § 1955(b)(2).").

B. **Statutory Text and Legislative History are Ambiguous**

1.**Text**

The import of § 1955(b)(2) is unclear from the face of the statute. The IGBA criminalizes illegal gambling businesses, not illegal gambling itself. 18 U.S.C. § 1955(a). The elements of an IGBA offense are commonly drawn from subsection (b)(1). *See, e.g., Gotti*, 459 F.3d at 340. In this subsection, an illegal gambling business is defined, in part, as "a violation of the law of a State or political subdivision in which it is conducted," 18 U.S.C. § 1955(b)(1)(i), without reference to the definition of gambling set forth in § 1955(b)(2). Like the definition of "State," 18 U.S.C. § 1955(b)(3), the definition of gambling is set forth in a separate subsection, (b)(2), from the elements of the offense.

Unless Congress manifests an "intent to incorporate diverse state laws into a federal statute, the meaning of [a] federal statute should *not* be dependent on state law." *United States v. Turley,* 352 U.S. 407, 411 (1957) (emphasis added); *accord Dickerson v. New Banner Inst., Inc.,* 460 U.S. 103, 119 (1983) (noting presumption that "when Congress enacts a statute[,] . . . it does not intend to make its application dependent on state law" (internal citations and quotation marks omitted)). Congress incorporated state law in § 1955(b)(1). The question remains, however, what it did in § 1955(b)(2).

Subsection b(2) focuses on activities associated with running a gambling business rather than with gambling itself. It states that gambling is "poolselling" and "bookmaking," rather than placing bets; "*maintaining* slot machines, roulette wheels or dice tables," rather than playing slots, roulette, or dice; and "*conducting* lotteries, policy, bolita or numbers games, or *selling* chances therein," rather than purchasing lottery tickets or chances. 18 U.S.C. § 1955(b)(2) (emphasis added). This focus bolsters the position that Congress was concerned with illustrating

types of gambling businesses (presumably as defined by state law) rather than on creating a limiting definition of gambling under federal law. Moreover, this list is non-exclusive; it "includes but is not limited to" the enumerated games. See *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there").

At the same time, if the statute was designed to federalize all state gambling offenses, it need not have included *any* definition of gambling. Had Congress desired to make the statute "all-encompassing, it is hard to see why it would have needed the examples at all." *Begay v. United States*, 553 U.S. 137, 142 (2008). In *Begay*, the Supreme Court confronted a similarly-phrased statute, which defined "violent felony" for the purpose of sentencing as:

> any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that
>
> **(i)** has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> **(ii)** is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B)(ii). Like the list in the IGBA, the "otherwise involves" clause plausibly implied that the list of crimes was non-exclusive. Justice Breyer, writing for the court, held that not all crimes that posed a "serious potential risk of physical injury," but only those sufficiently similar to "burglary, arson, or extortion" or crimes "involve[ing] use of explosives," would violate § 924(e)(2)(B)(ii). *Begay,* 553 U.S. at 142.

> If Congress meant clause (ii) to include *all* risky crimes, why would it have included clause (i)? A crime which has as an element the "use, attempted use, or threatened use of physical force" against the person (as clause (i) specifies) is

likely to create "a serious potential risk of physical injury" and would seem to fall within the scope of clause (ii).

Of course, Congress *might* have included the examples solely for quantitative purposes. Congress might have intended them to demonstrate no more than the degree of risk sufficient to bring a crime within the statute's scope. But were that the case, Congress would have likely chosen examples that better illustrated the "degree of risk" it had in mind. . . .

These considerations taken together convince us that, "'to every clause and word of this statute,'" we should read the examples as limiting the crimes that clause (ii) covers to crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves.

*Id.* (internal citations omitted). In the instant case, Congress could have explicitly defined gambling under the IGBA to mean criminal gambling as defined by state law. It did not.

Based on the text of the IGBA, § 1955(b)(2) could serve two distinct purposes. First, as advocated by the defendant, it could limit what kinds of state gambling crimes would trigger IGBA liability by providing an independent federal definition of gambling. Second, as advocated by the government, it could simply indicate what categories of state laws are gambling laws—i.e., laws that criminalize "pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein" or similar activities forbidden by state law, as opposed to laws criminalizing the practice of medicine by unlicensed professionals. Under the government's interpretation, a business that violates any state criminal prohibition on gambling, as gambling is defined by that state, would be prosecutable under the IGBA. Further, it would ensure that a business that violates other state criminal prohibitions unrelated to that state's definition of gambling—such as an unlawful medical corporation—would not be prosecutable.

Both readings are plausible. Neither would violate the "cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Duncan v.*

*Walker,* 533 U.S. 167, 174 (2001) (citing *Williams v. Taylor,* 529 U.S. 362, 404 (2000) and *Market Co. v. Hoffman,* 101 U.S. 112, 115 (1879)).

## 2. **Legislative History**

The legislative history does not settle the dispute.  As is often the case "[i]n any major piece of legislation, the legislative history is extensive, and there is something for everybody." Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 36 (Amy Gutmann, ed. 1997).

The purpose of the IGBA was to extend federal criminal jurisdiction over intrastate gambling businesses of a significant size in order to attack organized crime.  *See* Part IV(A)(4)(a), *supra.*  During the debates, the bill's proponents were chiefly concerned about the games enumerated in § 1955(b)(2), since those were the games which were, at the time, most frequently subject to Mafia control.  *See* Part IV(A)(4)(c), *supra.*  Yet members of Congress were uninterested in prohibiting any particular kind of gambling, which it viewed as a matter best left to the states.  *See* Part IV(A)(4)(a), *supra.*  Some members of Congress indicated that the IGBA included a broad definition of gambling encompassing every violation of State law; others implied that the definition was limited to the particular games enumerated in the statute. *See* Part V(A)(4)(b), *supra.*

Neither the IGBA as first introduced in both houses, nor the final adopted version, makes clear whether the statute federalizes all state gambling offenses.  *See, e.g.,* Illegal Gambling Business Control Act of 1969, S. 2022, 91st Cong., 1st Sess. § 201 (1969) ("[T]he term 'illegal gambling business' means betting, lottery, or numbers activity . . . [and] involves five or more persons who operate, work in, participate in, or derive revenue from said betting, lottery, or numbers activity . . . ."); 18 U.S.C. § 1955(b)(2); *see also House Judiciary Hr'gs* at 325 n.66

(Committee on Federal Legislation, The Association of the Bar of the City of New York, The Proposed Organized Crime Control Act of 1969 (S. 30) (1970)) ("The term 'gambling' is said to 'include' certain specified activities . . . without indicating whether the list is supposed to be all-inclusive."). The addition of a separate definition of gambling in a distinct section of the IGBA in the final version of the statute suggests a design adopting a distinct federal definition of gambling. No explanation for this change could be found in the legislative record.

### 3. **Other Federal Statutes**

Where other federal statutes are designed to incorporate all state law gaming offenses, this intent is specified explicitly. *See, e.g.,* 18 U.S.C. § 1166; *see also* Part V(B), *supra.*

### C. **Rule of Lenity Weighs in Favor of the Defendant**

The text, structure, and history of the IGBA fail to satisfactorily establish that the government is correct in its interpretation of the statute. Because "a reasonable doubt persists about a statute's intended scope," the rule of lenity applies. *Moskal,* 498 U.S. at 108; *see also* Part IV(B), *supra.* The defendant's narrower, more persuasive construction is adopted.

Nothing in the prior decisions requires a contrary result. Most courts that have assumed that a business that violates any state criminal gambling laws is subject to IGBA liability have not squarely addressed the issue. *See* Part VI(A), *supra.* As noted above, the Court of Appeals for the Third Circuit's reasoning in *Atiyeh* is not binding in the Second Circuit. *Id.*

The government argues that the defendant's interpretation would require "an ad hoc analysis of how similar or dissimilar the game was to those listed in IGBA's list of examples," creating an "extraordinarily complex and unpredictable approach to the statute." Gov't Response to Def.'s Mot. to Dismiss the Indictment 7, Doc. Entry 76, July 5, 2012; *see also id.* 5

("Under his theory, courts, whenever confronted with a game that is not in the illustrative list set forth in § 1955(b)(2), would be required to conduct an analysis in which certain "features" of the unlisted game are compared with "features" of the various exemplars, even where the unlisted game is indisputably a proscribed form of gambling under the referenced state law. This would add a new factual element for the government to prove to obtain a conviction. It would also result in widely divergent interpretations of the law as different courts would understandably arrive at distinct conclusions as to what were the most significant "features" of the activities listed in § 1955(b)(2)."); *see generally* Gov't Mem. of L. in Opp. to Def.'s Rule 29 Mot. 10-12, Doc. Entry 96, July 27, 2012. This may be so. Nevertheless, given the ambiguities in the statute, such case-by-case analysis in ambiguous cases is what the statute, interpreted in light of the rule of lenity, demands.

VII.    **Poker is Not Gambling Under IGBA**

Since games run by the defendant's business must constitute "gambling" as defined by the IGBA, it must be determined whether poker falls under that definition of gambling.

As noted above, the IGBA defines "gambling" as "includ[ing] but . . . not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein." 18 U.S.C. § 1955(b)(2). The list is non-exclusive. Although poker and other card games requiring skill were widely played when the IGBA was passed, such games are not included in that provision's list of gambling activities. *See McBoyle*, 283 U.S. at 26 (noting that "[a]irplanes were well known in 1919 when this statute was passed, but it is admitted that they were not mentioned in the reports or in the debates in Congress" in holding that an airplane is not a vehicle).

Yet, the fact that the statute does not explicitly mention poker, in itself, is not conclusive evidence that that game should not be considered gambling under the IGBA. *Cf., e.g., National Organization for Women*, *Inc. v. Scheidler*, 510 U.S. 249, 262 (1994) ("The fact that [the Racketeering Influenced Corrupt Organizations Act (RICO)] has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth."); *Bridge v. Phoenix Bond & Indemnity Co.,* 553 U.S. 639, 550 (2008) ("We have repeatedly refused to adopt narrowing constructions of RICO in order to make it conform to a preconceived notion of what Congress intended to proscribe.").

> As one court has aptly put it, '[n]ot every silence is pregnant.' In some cases, Congress intends silence to rule out a particular statutory application, while in others Congress' silence signifies merely an expectation that nothing more need be said in order to effectuate the relevant legislative objective. In still other instances, silence may reflect the fact that Congress has not considered an issue at all. An inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent.

*Burns v. United States*, 501 U.S. 129, 136 (1991) (quoting *Illinois Dep't of Public Aid v. Schweiker*, 707 F.2d 273, 277 (7th Cir. 1983)), *abrogated on other grounds as recognized by, Irizarry v. United States*, 553 U.S. 708 (2008).

The defendant points out that "Congress 'does not, one might say, hide elephants in mouseholes.'" *Bilski v. Kappos*, 130 S.Ct. 3218, 3250 (2010) (internal citations and quotations omitted). The question remains whether poker is an elephant or a mouse under the statute.

Poker is, for the purposes of this case, an elephant—or perhaps an eight hundred pound gorilla—that Congress would have been unlikely to ignore. The fact that card games like poker, pinochle, gin rummy, and bridge were so widely played by law-abiding individuals in non-criminal settings may explain its omission from the IGBA. As Sherlock Holmes would describe

the clue, it is the dog that didn't bark.  *See generally* Sir Arthur Conan Doyle, *Silver Blaze*, *in* The Memoirs of Sherlock Holmes 1-38 (Random House 2012) (1894).

As a matter of statutory construction, poker must fall under the general definition of gambling and be sufficiently similar to those games listed in the statute to fall within its prohibition.  *See Dauray,* 215 F.3d at 262.  It does not.

## A.  **No Controlling Federal Cases**

No court has ruled directly on whether poker constitutes gambling as defined by § 1955(b)(2).  Federal courts have upheld convictions under 18 U.S.C. § 1955 where the alleged gambling business involved illegal poker games following challenges unrelated to the issue of statutory interpretation now precisely presented.  *See generally United States v. Pack*, No. 92-3872, 1994 WL 19945 (6th Cir. Jan. 25, 1994) (table); *United States v. Reiger,* 942 F.2d 230 (3d Cir. 1991); *United States v. Zannino*, 895 F.2d 1 (1st Cir. 1990); *United States v. Dadanian*, 818 F.2d 1443 (9th Cir. 1987), *abrogated on other grounds by United States v. Wallace,* 848 F.2d 1464 (9th Cir. 1988); *Zemek*, 634 F.2d 1159; *United States v. Tarter*, 522 F.2d 520 (6th Cir. 1975) (affirming conviction of several defendants while reversing conviction of a defendant dealer due to insufficient evidence); *cf. United States v. 5185 S. Westwood Drive*, 2012 WL 1113197 (W.D. Mo. 2012) (discussing forfeiture of property at which defendant operated two tables of Texas Hold'em poker); *Dono*, 2009 WL 2405886 (providing a statement of reasons for sentence imposed on defendant for a § 1955 violation for operating an illegal gambling business of poker games in violation of New York Penal Laws § 225.05 and 20, among other offenses); *Uvino*, No. 2009 WL 2366562 (same); *United States v. Dey*, 07-CR-725, 2009 WL 1730956 (E.D.N.Y. June 18, 2009) (Weinstein, J.) (same); *Digiacomo*, 746 F. Supp. 1176 (discussing release pending trial of defendants accused of running illegal poker games, among other

103

offenses); *but cf. United States v. Vandetti*, 623 F.2d 1144 (6th Cir. 1980) (finding that there was

sufficient evidence to convict defendant for running an illegal gambling business at which

blackjack and seven-card stud poker were played, but remanding on other, unrelated grounds);

*United States v. Bridges*, 493 F.2d 918 (5th Cir. 1974) (reversing defendant's conviction under §

1955 for running a gambling business involving poker and craps shooting because the

government failed to show that five persons were involved in the business for a period in excess

of thirty days).  "Questions which merely lurk in the record, neither brought to the attention of

the court nor ruled upon, are not to be considered as having been so decided as to constitute

precedents."  *Webster v. Fall,* 266 U.S. 507, 511 (1924).  These prior cases are not determinative.

　　　The Court of Appeals for the Second Circuit has not passed on the issue.  While it has

upheld a conviction for running an illegal gambling business involving Joker Poker on the basis

that that variant was a game of chance, *see Gotti,* 459 F.3d at 342, Joker Poker involves

significantly less skill than the live Texas Hold'em games operated by the defendant in the

instant case.


　　　　　B.  **Only "Games of Chance" Are Gambling Under IGBA**

　　　　　Unlike other provisions of the Unites States Code dealing with gambling, the IGBA does

not provide explicit criteria for what constitutes gambling.  *Compare* 31 U.S.C. § 5362(1)(A)

(defining a "bet or wager," an essential characteristic of gambling under the Unlawful Internet

Gambling Enforcement Act of 2006, as "the staking or risking by any person of something of

value upon the outcome of a contest of others, a sporting event, or a game subject to chance,

upon an agreement or understanding that the person or another person will receive something of

value in the event of a certain outcome").  In light of the ambiguities in the federal definition of

gambling, governing criteria must be derived by determining what common characteristics

104

unifies the games listed in § 1955(b)(2) into a cohesive group. *See United States v. Turkette*, 452 U.S. 576, 581 (1981) ("The rule of *ejusdem generis* . . . comes into play only when there is some uncertainty as to the meaning of a particular clause in a statute").

The defendant contends with some force that all of the enumerated games are "house-banked" and that chance predominates over the skill of the players in determining the outcome. Def.'s Mem. of L. in Supp. of Mot. for a Judgment of Acquittal Under Rule 29 of the Federal Rules of Criminal Procedure 10-11, Doc. Entry 92, July 19, 2012.

> In all nine listed activities, the players wager on "fortuitous event[s]." In pool-selling and bookmaking, the fortuitous event is typically the outcome of a sporting event, over which the bettors exercise no control. In slot machines, roulette, and dice tables, the fortuitous event is the whirring of the slot machine mechanism, the turn of the wheel, or the roll of the dice. In lotteries, policy, bolita, and numbers, the fortuitous event is the draw of a random number. These activities are also "game[s] of chance" because the bettors exercise little or no control over the events that determine whether they win or lose.

*Id.* at 10.

The government argues with equal force that any game in which something of value is wagered on a future event constitutes gambling. Gov't Mem. of L. in Opp. to Def.'s Rule 29 Mot. 19, Doc. Entry 96, July 27, 2012 (citing *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225-26 (2008) (declining to adopt a narrower interpretation of enumerated items where broader interpretation comported equally well with statute at large)). Moreover, it contends that 1) other enumerated games also involve skill, eliminating chance as the relevant criterion; and 2) although not house-banked, poker is equally profitable for the house. *Id.* at 29-33.

### 1. **Statute is Ambiguous**

#### a. **Text**

The text of the statute does not provide sufficient guidance to decide the meaning of "gambling." The "carve out" provision exempts games of chance operated by tax-exempt organizations from IGBA enforcement. 18 U.S.C. § 1955(e) ("This section shall not apply to any bingo game, lottery, or similar game of chance conducted by [a tax-exempt organization]."). An element of chance thus has some relevance to the federal definition of gambling. Moreover, it would be notably odd if games of skill were encompassed in the federal definition, but only games of chance were exempted from prosecution under § 1955(e). Yet there is no definitive indication whether the statute would apply to a game of skill, or whether chance is the relevant criterion unifying the games enumerated by § 1955(b)(2).

#### b. **Dictionary and Common Law Definitions**

Dictionary definitions of gambling vary; some, but not all, require that the wager be placed on a game of chance or an uncertain outcome. *See* Part(V)(A)(2), *supra*. At common law, gambling consisted of wagering something of value on the outcome of a game in which chance predominated over skill. *See* Part V(A)(3), *supra*.

> [W]hen Congress uses language with a settled meaning at common law, Congress presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.

*Beck v. Prupis*, 529 U.S. 494, 501 (2000) (internal citations and quotations omitted).

### c. **Legislative History**

The legislative history is inconclusive. Nowhere did Congress seriously debate how to define gambling, or discuss what kinds of games beyond those enumerated should fall within the IGBA's purview. Nor is it clear that Congress anticipated that the statute would reach poker businesses. Although two senators expressed concern that the IGBA would encompass poker games, *see* Part V(A)(4)(c), "[p]assing references and isolated phrases are not controlling when analyzing a legislative history." *Dep't of State v. Washington Post Co.*, 456 U.S. 595, 600 (1982); *see also Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 204 n. 26 (1982) ("[I]solated statements in the legislative history . . . are too thin a reed on which to base an interpretation of the Act which disregards both its language and the balance of its legislative history.").

Sought by Congress in 1970 was an additional tool to combat organized crime by permitting federal prosecution of illegal intrastate gambling rings that funded and facilitated the activities of such groups. *See* Part V(A)(4)(a). To the extent that particular games were discussed, these appeared to be the games that were perceived to be most subject to organized crime influence at the time the IGBA was debated. *Id.* The relevant debates focused on numbers and bookmaking.

Yet "a statute is not to be confined to the 'particular application[s] . . . contemplated by the legislators.'" *Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980) (internal citations and quotations omitted). It is difficult to imagine that the statute was designed to preclude prosecution of games such as poker *if*, in the future, they became subject to Mafia control. *See United States v. Gooch*, 297 U.S. 124, 128 (1936) (holding that *ejusdem generis* "may not be

used to defeat the obvious purpose of legislation"). And such games have subsequently become a source of revenue for organized crime. *See* Part V(A)(6), *supra*.

Although the final report of the Commission on the Review of the National Policy Towards Gambling does occasionally mention poker, supporting the inference that it was considered gambling at the time the statute was enacted, the scant references to it indicates that poker was not considered a significant target of gambling laws. *See* Part V(A)(5), *supra*.

### d.  **Other Federal Statutes**

Neither poker nor any other game of skill is explicitly included under the purview of other federal laws criminalizing gambling. Federal gambling laws historically targeted games of chance. 15 U.S.C. § 1171 (defining a gambling device as one which involves "the application of an element of chance"); 15 U.S.C. § 1178(2) (excluding from the statute devices that do not involve an element of chance); 18 U.S.C. § 1081 ("'[G]ambling establishment' means any common gaming or gambling establishment operated for the purpose of gaming or gambling, including accepting, recording, or registering bets, *or carrying on a policy game or any other lottery, or playing any game of chance, for money or other thing of value*." (emphasis added)). Even modern laws limit their scope to such games. 31 U.S.C. § 5362(1)(A) (defining unlawful internet gambling, in relevant part, as the placing of a bet or wager—i.e., "the staking or risking by any person of something of value upon the outcome of a contest of others, a sporting event, or *a game subject to chance*, upon an agreement or understanding that the person or another person will receive something of value in the event of a certain outcome").

Several statutes focus on the same games of chance listed in the IGBA. *See* 18 U.S.C. § 1953 (criminalizing "knowingly carr[ying] or send[ing] in interstate or foreign commerce any record, paraphernalia, ticket, certificate, bills, slip, token, paper, writing, or other device used, or

to be used, or adapted, devised, or designed for use in (a) bookmaking; or (b) wagering pools with respect to a sporting event; or (c) in a numbers, policy, bolita, or similar game shall be fined under this title or imprisoned for not more than five years or both"); 18 U.S.C. § 1084 (prohibiting the transmission of bets or wagers on sporting events).

While the IGRA would regulate poker in Indian lands, *see* 25 U.S.C. § 2703(7)(A)(ii) (defining non-house-banked card games as "class II" games), that game can be subjected to less stringent regulation than the games enumerated by the IGBA, *see* 25 U.S.C. § 2703(8); *Northern Arapaho Tribe v. Wyoming*, 389 F.3d 1308, 1310 (10th Cir. 2004) (stating that class III games include "roulette, blackjack, and parimutuel wagering"), indicating that Congress may have seen a qualitative difference between these types of games. The IGRA was designed to deal with the sensitive question of regulating Indian gaming establishments—not the illegal gambling establishments funding organized crime outside Indian Territory, as was the IGBA.

Poker would also fall under the definition of gambling guiding the NGIS Commission's study of that activity. Yet, although the NGISC Act is incorporated into the notes of § 1955, its definition is different and substantially broader than that provided by the IGBA and other federal gambling laws. Since the NGISC Act did not alter the text of the IGBA itself, it cannot be said to have amended that statute's definition of gambling.

## 2. Gambling Not Limited to House-Banked Games

There is no evidence in the record that Congress considered whether a game was house-banked was a relevant characteristic in determining whether it constituted gambling under the IGBA. Neither dictionary nor common law definitions of gambling distinguish between games based on that factor. Nor does any federal gambling statute other than the IGRA rely on whether a game is house-banked to define its scope.

### 3. Gambling is Limited to Games Predominated By Chance

The government contends that chance is not the relevant criterion limiting the IGBA's definition of gambling because other forms of gambling involve skill. For example, "betting on the outcome of professional sports events"—which would fall under either "bookmaking" or "pool-selling"—"involves an element of skill in picking the winning team or predicting the outcome of the game." *Dalton*, 835 N.E.2d at 1193 n. 9; Office of the Att'y Gen. of the State of New York, Formal Op. No. 84-F1, N.Y. Op. Atty. Gen 11 (1984) (stating that sports betting requires "substantial (not 'slight') skill," including "the exercise of [a] bettor's judgment in trying to . . . figure [out] the point spreads"). "Sports bettors have every opportunity to employ superior knowledge of the games, teams and players involved in order to exploit odds that do not reflect the true likelihoods of the possible outcomes." Gov't Mem. of L. in Opp. to Def.'s Rule 29 Mot. 30, Doc. Entry 96, July 27, 2012. Similarly, other card games commonly considered gambling, such as blackjack, demand talents similar to those employed in poker, requiring skilled players to take advantage of known odds. *Id.* at 29-30; *see generally, e.g.,* Ben Mezrich, *Bringing Down the House: The Inside Story of Six MIT Students Who Took Vegas for Millions* (2003) (describing a group of students and ex-students from the Massachusetts Institute of Technology who used card-counting techniques and other sophisticated strategies to beat casinos at blackjack); *Blackjack,* This American Life (NPR radio broadcast June 8, 2012), http://www.thisamericanlife.org/radio-archives/episode/466/blackjack (discussing card-counting in blackjack).

Contrary to the government's argument, chance (as compared to skill) has traditionally been thought to be a defining element of gambling and is included in dictionary, common law, and other federal statutory definitions of it. *See* Part V(A)(2)-(3), (B), *supra*. The influence of

skill on the outcome of poker games is far greater than that on the outcomes of the games enumerated in the IGBA's illustrations of gambling. While a gambler with an encyclopedic knowledge of sports may perform better than others when wagering on the outcome of sporting events, unlike in poker, his skill does not influence game play. A sports bettor is better able to pick a winning team, but cannot make them win. In poker, by contrast, increased proficiency boosts a player's chance of winning and affects the outcome of individual hands as well as a series of hands. Expert poker players draw on an array of talents, including facility with numbers, knowledge of human psychology, and powers of observation and deception. Players can use these skills to win even if chance has not dealt them the better hand. And as the defendant's evidence demonstrates, these abilities permit the best poker players to prevail over the less-skilled players over a series of hands. *See* Al Alvarez, The Biggest Game in Town 45 (1983) ("In poker, as in golf, . . . [poker players] are betting on their own skills. The cards go round, but in the end the best players win. When the poker players bet on sports, however, they are putting down gigantic sums on events wholly beyond their control. . . . 'Players who make tremendous amounts of money through their talents at the poker table go out and destroy it betting on things they have no control over,' [A.J.] Myers[, a regular and successful tournament poker player,] said.")

Congress could have specified that gambling was limited to games of chance, or included poker in the "carve out" provision of the IGBA. *See Turkette*, 452 U.S. at 581 (declining to hold that RICO was limited to legitimate enterprises under *ejusdem generis*, as proposed by the defendant, where Congress could easily have specified that element by including additional wording in the statute's text). Yet it also could have specified that it encompassed all state laws prohibiting gaming, as it did in 18 U.S.C. § 1166, either explicitly or by failing to include a

federal definition of gambling at all.  It did neither.  While the statute's purpose, controlling organized crime, might argue in favor of a broad definition of gambling, dictionary, common law, and other federal definitions of gambling argue in favor of a definition limited to games of chance.

Whether the ambiguities in the statute are the result of inadequate drafting or of a conscious choice, born of political compromise, to leave issues for the courts to resolve, they must be construed in favor of the defendant.  Under either the definition of gambling as proposed by the defendant or that proposed by the plaintiff:

> [A]ll provisions of the federal . . . statute are coherent; no provisions are redundant; and the statute is not rendered utterly absurd. From the face of the statute, there is no more reason to think that [one definition is more correct than the other]. Under a long line of our decisions, the tie must go to the defendant.

*Santos*, 553 U.S. at 514 (plurality op.).  In order to constitute an illegal gambling business under the IGBA, as at common law, the business must operate a game that is predominately a game of chance.

### C.  **Poker is Predominated By Skill Rather than Chance**

As pointed in Part IV(B), *supra*, the burden is on the government to show that its interpretation of the IGBA is correct.  Although many states, including New York, consider poker to fall within the common law definition of gambling as a game of chance, *see* Part II(B)(5), *supra,* this factor is not determinative in construing a federal statute.  The government must demonstrate that it is more probable than not that poker is predominated by chance rather than skill.  It has failed to do so.

The government acknowledges that skill plays a role in poker.  Game play in poker is influenced by both the cards dealt (determined by chance) and the decisions made by players

(determined by skill). While players' actions are influenced by chance events, their decisions are based on skill. Players' decisions, in turn, affect game play, both in the hand being played and in subsequent hands. By bluffing, for example, players can overcome the power of chance and win a hand despite holding inferior cards.

The majority of poker hands end when one player induces his opponents to fold. *See* PPA Mot. for Leave to File an Amicus Br. Ex. A (Paco Hope & Sean McCulloch, Statistical Analysis of Texas Hold'em 14 (Mar. 4, 2009) (unpublished article)), Doc. Entry 74, July 3, 2012. Since the cards are never revealed or compared, the players' decisions alone determine the outcome. *Id.* The ability of players to influence game play distinguishes poker from the other games, such as sports betting (bookmaking), enumerated in the IGBA.

That chance plays some role in the outcome of the game does not imply that poker is predominately a game of chance rather than predominately a game of skill. Chess, a game in which all possible moves are known in advance, can be characterized as a pure game of skill, *see, e.g.,* Gov't Expert *Daubert* Hr'g Tr. 40:7-12, 40:19-21. In poker, by contrast, players cannot know what cards the "luck of the draw" will deal them. The same can be said of bridge, where the "luck of the draw" is an element in overall wins and losses. Chance also influences many sports, such as golf. *See, e.g., PGA Tour, Inc. v. Martin*, 532 U.S. 661, 687 (2001) ("[G]olf is a game in which it is impossible to guarantee that . . . an individual's ability will be the sole determinant of the outcome. For example, changes in the weather may produce harder greens and more head winds for the tournament leader than for his closest pursuers. A lucky bounce may save a shot or two. . . . [C]hance may have a[n] . . . impact on the outcome of elite golf tournaments."). Yet no one would dispute that bridge and golf are games of skill.

The fundamental question is not whether *some* chance or skill is involved in poker, but what element *predominates*. To predominate, skill must account for a greater percentage of the outcome than chance—i.e., more than fifty percent.

Two well-qualified and prepared experts have testified in this case. The defendant's expert, Dr. Heeb, has presented persuasive evidence proving that skill predominates over chance in poker. His points are summarized as follows:

> (1) [P]oker involves a large number of complex decisions, which allow players of varying skill to differentiate themselves . . . ; (2) many people play poker for a living and consistently win money over time . . .; (3) players who obtain superior results with other starting hands tend to obtain superior results with any given hand, indicating that the players' abilities, not the cards, are responsible for the results . . . ; (4) the published studies are all consistent with [these] conclusions.

Def. Letter Addressing Issues Raised at Aug. 10 *Daubert* Hearing 1, Doc. Entry 104, Aug. 13, 2012 ("Def.'s Post-*Daubert* Letter"). Dr. Heeb demonstrated that skill could be shown statistically to determine more than 50% of the outcome in poker in as few as 240 hands—a number of hands which would be played in a typical social game, or in a single session at defendant's shop. Def. Expert Supp. Report at 9-10. He concluded that "poker is a game of skill on every hand that is played," even if "proving this statistically requires a sufficient number of hands." *See id.* at 3.

The government's expert, Dr. DeRosa, has not submitted any contrary analysis, nor any studies which support the conclusion that chance predominates over skill in poker. His questions regarding Dr. Heeb's data set were answered to the court's satisfaction at Dr. DeRosa's *Daubert* hearing, in which Dr. Heeb participated. *Id.* 71:15 – 74:8.

The crux of Dr. DeRosa's remaining objections are four-fold.

First, Dr. DeRosa demonstrated—as was conceded by Dr. Heeb, *see* Gov't Expert *Daubert* Hr'g Tr. 84:1-8—that what may appear to be persistent differentials in the outcomes of

skilled and unskilled players, *see* Fig. 1, *supra*, can be duplicated by completely random, unskilled play, like a coin toss, *see* Fig. 7, *supra*, and accompanying text.  *See* Gov't Reply Letter at 3-4.  Yet, as noted by Dr. Heeb:

> Skill is observed to be persistent in several other analyses of the PokerStars data. Skillful players are more successful than less skilled players with every possible starting hand.  Skillful players earn more profit than less skilled players with every possible winning hand type.  Finally, skillful players reliably outperform less skillful players after a sufficiently long contest.

Def. Expert Supp. Report at 4.  Dr. Heeb was also able to show that, unlike the unskilled coin tossers relied upon by Dr. DeRosa, the most skilled poker players continue to perform well, and the least skilled players continue to perform poorly, prospectively.  *See* Part II(B)(3)(c), *supra*. The same could not be said of players in a game of pure chance, indicating that the persistence of success (or failure) in poker is the result of relative skill.  *Id.*  *But see* Gov't Reply Letter at 4 (noting that, in Dr. Heeb's experiment, "one of the bottom ten players earned more money than three of the top ten players, and the least successful top ten player lost more money than at least four of the bottom ten players" and arguing that this demonstrates "that chance is material in the game of poker").

Second, Dr. DeRosa implied that the relevant frame of reference for determining whether poker is a game of skill or a game of chance is a single hand rather than the large number of hands evaluated by the defendant's expert.  *See* Part II(B)(3)(b), *supra*; *see also* Gov't Reply Letter at 2-3 ("[P]layers are not obligated to play more than one hand, and they are free to leave after one hand. . . . Every game has a beginning and an end.  In golf, one typically plays nine or eighteen holes.  In baseball, there are nine innings, and in sports such as basketball and soccer, a game is complete after a specific period of time elapses. . . . A "poker game" does not consist of thousands of hands of poker played over a person's lifetime.").  Even in games of skill such as

golf or bridge, however, chance may play a determinative role in the outcome of a single hole or hand. An amateur may get a "lucky shot," or benefit from "the luck of the draw," and defeat an expert player in a single or even a few instances. Nevertheless, across a series of games—in numbers that would be expected to be played in a local poker establishment—the influence of skill becomes obvious and overwhelming. *See* Part II(B)(3)(c), *supra*. Even if a single hand is the relevant frame of reference, Dr. Heeb has shown that experts can outplay amateurs when dealt the same starting hand. *See* Part II(B)(3)(a), *supra*.

Third, Dr. DeRosa claimed that it is likely that an average poker player would play only a small number of hands, and the fewer the hands played, the more likely that chance rather than skill would predominate. *See* Part II(B)(3)(b), *supra*. Yet Dr. Heeb—who, unlike Dr. DeRosa, has experience playing poker—concluded that the "the number of hands by which the higher skilled players predominate with a high degree of certainty could be played in a few sessions of poker." Def. Expert Report at 45; Def. Expert Supp. Report at 4 (stating that a "serious poker player, even an amateur, can easily play thousands of hands a month in live play"); *see* Figs. 5, 6, *supra* (showing that skill predominates when considerably less than 1,000 hands are played). That number is easily reached by poker players in tournament play. *See* Gov't Expert *Daubert* Hr'g Tr. 92:22 – 93:8.

No field research or testimony indicating that an average player plays fewer hands than claimed by Dr. Heeb has been offered. And testimony at trial established to this court's satisfaction by a preponderance of the evidence that players at the defendant's establishment were regular customers who played for many hours at a stretch and returned again and again, buttressing Dr. Heeb's opinions. *E.g.* Tr. of Trial 47:7-8 (Testimony of Joseph George Monteleone), July 9, 2012 ("Q: And about how many times did you gamble [at the defendant's

establishment]?  A: From December of 2010 'til February 2011 twice a week."); *id.* 59:12-21

("Q: When did you typically arrive when you played games at [the defendant's establishment]?

A: Usually, give or take, 10:00 p.m.  Q: How long did you typically play?  A: Four to five hours.

Usually, I would leave around 2:00, between 2:00 and 3:00 a.m.  Q: Was the game breaking up

when you left?  A: No.  Q: Do you know when it ended?  A: Various nights, 6:00, 6:00 a.m.,

7:00 a.m.").

Finally, Dr. DeRosa correctly pointed out that all but the most skilled participants break

even or lose money at poker.  *See* Fig. 4, *supra*.  Since players play poker to win money, his

argument went, poker cannot be a game of skill.  This argument is inapposite.  The fact that

many players lose does not affect the quantity of skill demanded by a particular game.  The

objective of chess—or bridge, or golf—is similarly to win.  The fact that only one player or team

wins a game or tournament does not diminish the skill required to achieve that victory.  *See* Def.

Post-*Daubert* Letter at 2 ("[I]n many skill contests, most players lose (including losing money).

In chess tournaments, many skilled competitors pay entry fees, but only the top few receive

prizes, which means that the vast majority of chess players lose money by playing. . . . In

Olympic sports, all of the athletes are highly skilled, but only three competitors per event win a

prize.  The fact that players lose thus does not prove that they are unskilled, and it does not shed

light on the key question, which is what causes some players to win and others to lose."); Def.

Expert Supp. Report at 1 ("Consider golf, a game in which both skill and chance play a role, but

in which skill predominates.  The majority of golfers (like the majority of poker players) are non-

professionals.  These golfers nonetheless pay hundreds or thousands of dollars per year for

greens fees or club memberships to play golf.  Only a fraction of a percent of golfers are

professional, and not all of those earn enough to cover all of their expenses.  Only the top few

players earn enormous profits.  However, even among players who, on net, pay to play golf, a relative examination of skill and performance would reveal that golf is a game of skill for all of them.").

The average poker player is not so highly skilled as to take advantage of an advanced player's techniques and knowledge; yet skill, when sufficiently honed, makes the difference between winning and losing in poker.  *See* Fig. 2-3, *supra,* and accompanying text.  As in bridge, the champions who can consistently demonstrate that skill underlies success in the game are few. Dr. Heeb has shown persuasively that skilled players will predominated over the less skilled in a relatively short time.  Were the rake—the amount of money removed from the pot by the house—eliminated from the equation, less skill would be required to show a profit.  *See* Fig. 8, *supra,* and accompanying text.

Dr. DeRosa has provided no basis for the court to conclude that chance predominates over skill in poker.  The rule of lenity places the burden of proof on the government.  It has failed to show that it is more likely than not that chance predominates over skill in poker.  Dr. Heeb's studies and conclusions are found to be accurate and persuasive by this court, which heard and analyzed all the evidence.  Even were the expert testimony to have left the court in a state of equipoise, the rule of lenity requires that it find in favor of the defendant.

The conclusion that poker is predominately a game of skill does not undermine the holding that poker is gambling as defined by New York law.  While both New York State law and the IGBA require that a game involves chance, each apply different standards in determining whether a particular game is a game of chance or a game of skill.  *See* N.Y. Penal Law § 225.00(1) (defining a contest of chance as a "game . . . in which the outcome *depends in a material degree upon an element of chance*, notwithstanding that the skill of the contestants may

also be a factor therein" (emphasis added)). The test under the federal statute is one of *preponderance*, not *material degree.*


D. **Poker is Not Gambling Under IGBA**

Because the poker played on the defendant's premises is not predominately a game of chance, it is not gambling as defined by the IGBA. That the statute was targeted at limiting the influence of organized crime, and organized crime groups have operated poker games beginning in the years since its passage, does not retroactively change the statute's scope. "The statute should not be extended . . . simply because it may seem to us that a similar policy applies, or upon the speculation that if the legislature had thought of it, very likely broader words would have been used." *McBoyle,* 283 U.S. at 27.

As already noted, the IGBA is not the only tool available for the federal and state governments to prosecute organized crime involvement in poker games. If the Mafia operates such a game in an unlawful fashion (such as by also engaging in related loan sharking, extortion, or money laundering), the organizers and operators can be prosecuted under RICO, 18 U.S.C. § 1962. It is notable that no such evidence was present in this case. Illustrations in the government's brief of federal poker prosecutions appear to be for racketeering under that statute. *See* Gov't Mem. of L. in Opp. to Def.'s Rule 29 Mot. 23-25, Doc. Entry 96, July 27, 2012 (citing Ex. A-G attached to the same memorandum).

Even without the organized crime connection, this defendant's operations were necessarily and properly found by the jury to violate New York state gambling laws. He could have been prosecuted in state court by the Richmond County District Attorneys Office.

VIII.    **Conclusion**

Neither the text of the IGBA nor its legislative history demonstrate that Congress designed the statute to cover all state gambling offenses. Nor does the definition of "gambling" include games, such as poker, which are predominated by skill. The rule of lenity compels a narrow reading of the IGBA, and dismissal of defendant's conviction.

A reversal of this decision and reinstatement of the jury verdict by the Court of Appeals for the Second Circuit would not violate the defendant's Double Jeopardy rights. *See, e.g., United States v. Reyes*, 302 F.3d 48, 52 (2d Cir. 2002) ("[O]ur review of this appeal [by the government of the trial court's decision to set aside jury verdict of guilty] does not violate Reyes' constitutional protection against double jeopardy because in no event will he be subject to a second trial."); *United States v. Hundley*, 858 F.2d 58, 66 n.7 (2d Cir. 1988) ("Double jeopardy would bar the Government from appealing a judgment of acquittal entered before a verdict since reversal of the acquittal would result in a retrial, . . . but does not bar appeal of an acquittal entered after a guilty verdict because reversal requires only reinstatement of the conviction . . . ." (internal citations omitted)).

The indictment is dismissed. The jury verdict is set aside.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: August 21, 2012
      Brooklyn, New York